14067

## HUCKABEE v. LIFE INS. CO. OF VIRGINIA

(180 S. E., 32)

*Messrs. Henderson & Salley,* for appellant.

*Messrs. Williams & Busbee,* for respondent,

May 21, 1935.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

This action, by Jessie Huckabee, as plaintiff, against Life Insurance Company of Virginia, as defendant, commenced in the Court of Common Pleas for Aiken County, December 23, 1932, was instituted for the purpose of recovering judgment against the defendant in the sum of $185.00, together with 7 per cent. interest thereon from March 1, 1932, based on a policy of insurance issued by the defendant upon the life of George Turner, dated March 27, 1929, whereby the defendant obligated to pay to the plaintiff, a niece of the insured, as beneficiary thereunder, the amount for which the policy was issued, upon the death of the insured, on condition that the premiums stipulated in the policy should be paid as required under the terms thereof. In response to the allegations of the complaint the defendant interposed a general denial. Issues being joined, the case was tried at the November, 1933, term of said Court before his Honor, Judge J. Henry Johnson, and a jury, resulting in a verdict for the plaintiff for the full amount involved in the suit. From the judgment entered on the verdict, the defendant, pursuant to due notice, has appealed to this Court.

The case was tried in the lower Court jointly with the case of Willie Free against the same defendant, and there is pending in this Court an appeal in that case, also, but separate opinions in the cases will be filed. In this, the *Huckabee case,* the appellant asks a reversal of the judgment in the lower Court on the following allegations of error imputed to the trial Judge: "(1). On the ground that the Presiding Judge erred in refusing to sustain defendant's motion for a directed verdict made on the ground that the testimony left to conjecture and surmise alone the determination of the time of the death of George Turner; it being submitted that the Court should have sustained the motion for a directed verdict·upon the grounds made, it appearing

from the whole testimony that the time of the death of George Turner was unknown, no testimony being presented that George Turner was alive on the 15th day of January, 1931, and that the testimony left to conjecture and surmise the determination of the date of the death of the said George Turner. It is submitted that under the law and the decision of the Supreme Court of South Carolina that the truth of the basic fact involved; namely, whether George Turner was dead or alive on the 15th day of January, 1931, when the policy in question finally lapsed, may not be left to conjecture and surmise."

It is admitted that proof of death was filed, and it clearly appears from the record in the case that the premiums on the policy involved were paid until December 15, 1930, and, under the terms of the policy, this payment carried the policy until December 22, 1930, and, further, that under the provisions in the policy for a grace period of four weeks the policy did not expire for nonpayment of premiums until January 19, 1931. It appears from the transcript of record that the insured, the said George Turner, disappeared some time during the year 1930, and, according to the agreed statement set forth in the transcript of record, it is conceded that the sole question involved in the appeal is whether there was sufficient testimony to take to the jury the question of whether George Turner was alive on the 15th day of January, 1931, when the said policy finally lapsed.

According to the record before us, the facts in the case necessary for a decision of the questions involved, briefly stated are as follows: The insured was in the County Home at Aiken, S. C., and, as stated, disappeared some time in the year 1930, the exact date of his disappearance not being established. Later, about two years after the disappearance from the said County Home, a skeleton and certain other evidence referred to in the testimony were found about two miles from the town of

Montmorenci. Were these the remains of the insured, George Turner? If so, when did he die? As bearing directly on these questions, we quote herewith the following testimony, as disclosed by the record of C. M. Thompson, superintendent of said Aiken County Home:

"I am Superintendent of the Aiken County Home. George Turner was an inmate there. As well as I remember, it was some time in June of 1930 when I saw him last. I drove mighty nearly over Aiken County a time or two to find him.

"On or about the 10th day of February, 1932, about a mile off in the woods from the dirt road going out from Montmorenci, I saw a skeleton consisting of ribs, backbone, hipbone, legs and skull, also a pair of shoes. The shoes were just like those issued by me at the County Home. George Turner was wearing a pair of shoes like those when he left. I left these things at the Courthouse. I had had no white men leave the County Home with shoes on before Mr. Turner left that I did not hear from any more. The shoes were tan shoes and every day work shoes with broad toe and cap. I found some overall buckles. Mr. Turner had on overalls when he left the Home. There was no sign of flesh there. The bones were bleached from exposure to the weather. No white man had left the Home since June 30th, that I did not find. The skull was small and Mr. Turner had a very small skull.

"Q. In your opinion, Mr. Thompson, after giving those facts that you have—what is your opinion—in your opinion whose skeleton was it?

"Mr. Henderson: I object to that, as that is what we are investigating.

"The Court: Our Courts have held that a layman can give his opinion after stating the facts, but I think he has to have more facts than this witness has testified to to base his opinion on.

"The Court: Did the County bury the skeleton?

"Witness: No, sir, I never have seen them since I turned it over to the Sheriff.

"Mr. Turner was a tall man and those bones were tolerably tall. The shoes were like the same shoes I gave him, but I could not swear they were. These shoes (the shoes found with the skeleton) looked like the shoes that he wore from the County Home."

On cross examination of Mr. Thompson, he made this further statement in the case: "Nobody else disappeared from the County Home. We had some to leave last year and say they were going back where they came from. And one left last week and said he was going to get him a job, but there has been no other case with a death involved."

In the additional testimony given by this witness, C. M. Thompson, he made no material change in his testimony, quoted above, bearing on the questions involved herein.

As further bearing on the question involved, we quote the following testimony given on the trial by the witness, David Free:

"I am Mr. Turner's nephew. I remember the occasion of my uncle leaving the Poor House. I have not seen him since and we have made a search for him. I searched for him a good deal and others have, too. Before he left the Poor House, I had seen him pretty regularly, down at my house and at the County Home.

"Q. Did you ever see these shoes before? (Showing the witness the shoes in evidence.) A. Yes, sir.

"Q. Who had them when you saw them? A. George Turner.

"Q. Why do you say that? A. Because he was down there home and they were practically new shoes and he had a bunion or something on his toe and he tried to get me to fix it, and I took my knife and cut inside and there is the mark I cut in there (indicating to counsel), and that is the reason I know it was him. I tore out a little piece as I could not get the knife in there very good.

"Q. Show that to Mr. Henderson. A. You can see where the knife cut in there, and I know it is the shoe.

"Q. This is what you are talking about here—this little strip? A. Yes, sir, you can see where it is cut there and that is where I tried to cut it. It is on the border of the big toe.

"Q. Mr. Free, is that shoe there, come here and show the jury that, please, is that where you gouged uot? A. Yes, sir. The bunion was on his big toe. He had no teeth. The remains were buried at Piney Grove Church where my relatives were buried. Dan Boyd, my brother, and Huckabee and I buried the remains. My uncle had no horse or automobile, but walked.

## Cross Examination

"I said he had the bunion right under there and under the ball of the big toe and at that knuckle. I saw the bunion. I tried to fix it by gouging.

"Q. You tried to fix it by gouging it with the knife? A. Yes, sir, but the poor old fellow was disabled to do anything, and he was sitting there crying on my front porch, and they were practically new shoes, and I tried to move it, but I could not get my hand down in there.

"Q. The leather was still there to rub against him? A. Yes, sir, I did that about two weeks or maybe three weeks before he was missing from the Poor House. I could not tell to save my life the date it was. The year was 1930."

As bearing on the question involved, we also quote the following from the testimony of the witness, Will Free: "We put the remains that were found, in a box and carried them to Pine Grove Cemetery and buried them where our relatives are buried. My uncle was a tall and slender man, and that was a man's skeleton that resembled my uncle's. He had a high-up forehead and he was grey-headed and there were a few grey hairs back on that skeleton. My uncle had no teeth and we found none with these bones."

In the course of his testimony the witness D. T. Huckabee, husband of the plaintiff, testified on the question involved to the following effect:

"My wife, Mrs. Jessie Huckabee, was, before her marriage, Jessie Free, a niece of Mr. George Turner. We got the skeleton and shoes from the Sheriff's office and buried the skeleton at Pine Grove.

"The policy of insurance still belongs to my wife. I paid the premiums on it for her myself. This book, Exhibit No. 7, is her book, and it shows that the last payment was made on the 12th month and 15th date, 1930. I think about the 1st of June, 1930, we were notified that he had left the poor house. When he left previously he would visit my wife and go down to Willie's and then to Dave's. There were three of us, and he would go from one place to the other. When he was missing about the 1st of June, Mr. Thompson and myself went to locate him. We published in the newspapers and put his picture in the paper . and I went to Augusta and broadcast it over the radio that he was missing and we never saw him any more. * * * My mind was satisfied that I could not locate him. Mr. Turner's build was high and slender and I would imagine about five feet and ten inches and he had a thin shaped head and he was bald on top. He had a high forehead. The skeleton we found had a thin head and it resembled the one Mr. Turner had, and I was satisfied it was his head. I saw the shoes and they were like the shoes he wore. He had a pair of tan shoes and they were practically new when he went back to the County Home the last time, and these we found down here were tan shoes. There were no teeth in his head, and he had none when I last saw him.

"The skeleton was found in February, 1932. * * *

"He visted Mr. Casnetti and his son live down there, but I do not know how far from Windsor they lived. He lived on the right of Windsor about four or five miles. I would

say Mr. Turner was 52 or 53, or somewhere there, and probably a little older, but I could not say exactly.

"This skeleton was buried at Piney Grove Church in my square. We got the remains on Saturday, I think, and kept them until Sunday and then we buried them. I had several people examine them. We buried them in a homemade box. We have a grave there. I have five children besides that body there."

We also quote the following portion of the testimony of C. P. Beard:

"I knew George Turner well. He was tall and slim and had a kind of high head and it was thin. I saw the skeleton and it was tall and the head had a tall, slim face and skull.
*  *  *

"This skeleton had no teeth and Mr. Turner had no teeth."

The testimony of J. T. Tarver, coroner of Aiken County, which bears on the question involved, reads thus: "In February, 1932, I went down below Montmorenci and got a skeleton which we found on the edge of a swamp about two or two and one-half miles from Montmorenci, on the right hand side of the road leading from Montmorenci to Beulah, down there out from Windsor. We found an old pair of shoes there which looked like these (indicating the shoes put in evidence). I think we found an overall buckle. I brought the bones to the court house and I think some of the family got them. The bones were dry and were scattered a little.  *  *  *"

The witness, G. W. Burgess, testified that after he had viewed the remains in question he believed the same to be the remains of the said George Turner, and further stated that the shoes in question "were identically the same kind he had on" when he last saw him before he disappeared from the Aiken County Home.

C. T. Beauford, deputy sheriff for Aiken County, in the course of his testimony, stated, in effect, that he found the skeleton and shoes referred to about two miles from

Montmorenci and about one-half of a mile from the road, and further testified in this connection that the bones referred to were dry and looked as if they had been there a long time.

The exceptions to which we have referred in this case are based upon the alleged error that the trial Judge committed in overruling the motion for a directed verdict, which motion was based upon the ground that the time of the death of George Turner is left to conjecture and surmise by the evidence, and that the policy became void at the end of the four weeks after the premiums were not paid. As stated above, it is conceded by the parties litigant that only two questions arise: Were the remains in question the remains of George Turner, and, if they were, when did he die? After a study of the entire record in the case, and especially the testimony to which we have referred above, it is our opinion that these questions were proper questions for the jury. The testimony is clearly sufficient to raise a jury question as to whether the remains in question were the remains of George Turner. Then it becomes a question as to when he died, that is, whether he died within the time the policy was of force or after the policy had lapsed. In our opinion, the testimony is reasonably susceptible of the inference that he died before the policy lapsed, that is, before January 19, 1931. Therefore, it was proper for the trial Judge to refuse to direct a verdict and submit the issues to the jury.

The exceptions are, therefore, overruled, and the judgment of the lower Court affirmed.

Mr. Chief Justice Stabler, Mr. Justice Bonham and Messrs. Acting Associate Justices T. S. Sease and A. L. Gaston concur.