16484

### LIGON v. METROPOLIAN LIFE INS. CO.

(64 S. E. (2d) 258)

144

*Mr. J. Perrin Anderson,* of Greenwood, *for Appellant,*

*Messrs. Grier, McDonald, Todd & Burns,* of Greenwood, for *Respondent,*

March 27, 1951.

FISHBURNE, Justice.

This case was brought by plaintiff as administrator of the estate of Darragh Ligon, Sr., deceased, upon a certificate of insurance issued to Dendy Ligon, brother of the deceased, under a group policy, by the defendant, Metropolitan Life Insurance Company, for General Motors Corporation and its subsidiaries.

The insured, Dendy Ligon, was a negro employed by the Norwood Plant of the Chevrolet Company, a subsidary located at Cincinnati, Ohio. The plaintiff seeks to recover the sum of Two Thousand Dollars, the face amount of the certificate. The policy shows that the person first named therein as beneficiary was Darragh Ligon, Sr., who resided at greenwood, South Carolina, and who was a brother of Dendy Ligon. Thereafter, the beneficiary was changed on the policy to Mary Mathis, a niece of the insured; and later by assignment to Darragh Ligon, Sr., the original beneficiary.

The crucial question to be decided on this appeal,—and it was so treated by the trial court and by counsel for the parties —is whether Dendy Ligon, the insured, died prior to May 30, 1941, which is the date upon which the defendant stated that the policy was cancelled. As to this date there is some disagreement. But the lower court assumed this date as the correct date in passing its orders, which have been appealed from.

The circuit court upon the close of all the evidence, held that there was no evidence from which the jury could conclude that the insured died before the policy was cancelled for the nonpayment of premium, and upon motion of the defendant directed a verdict in its favor. Thereafter, the court denied a motion made by the plaintiff for a new trial.

There are other issues raised by the appeal, but we first direct our attention to what we regard as the main issue, and that is, does the record contain sufficient evidence from which

the jury could determine that the insured died while the policy was still in force.

· Dendy Ligon was a native of Greenwood, South Carolina. He moved to Cincinnati, Ohio, about the year 1925, and lived there until the time of his disappearance in the year 1941. During the greater part of the time that he lived in Cincinnati, he was employed as a workman in the Norwood Plant of the Chevrolet Company, but following an injury his employment was discontinued in 1938. Sometime during the year 1941, prior to May 30, 1941, as contended by appellant, Dendy Ligon disappeared and since that time has not been seen or heard from by his relatives or by any other person.

Appellant contends that the death of the insured is conclusively established by reason of unexplained absence for more than seven years, also that there was sufficient circumstantial evidence tending to show that he died not later than May, 1941. Dendy Ligon was never married. During the years he lived in Cincinnati prior to his disappearance, he shifted from one rooming house to another in the colored section of the city. His niece, Mary Mathis, who lived in Cincinnati from 1926 until 1948, described his way of life, his habits, and gave evidence as to the investigation which was made following his disappearance.

She testified that throughout the years, the deceased came to her house twice a month, and sometimes oftener. That he kept a trunk at her home, and his mail came to her address. In 1939, Darragh Ligon, Sr., came from Greenwood to Cincinnati, and carried the insured, on account of his mental condition, to the State Hospital in Columbia, South Carolina. The insured stayed there for some months, and upon his discharge was taken to Long View, a mental hospital in Cincinnati. He was in this institution for several months before he was discharged, but for a considerable length of time thereafter, he returned there for "shots." His brother, Darragh Ligon, Sr., had been appointed as Committee for him in 1939, and he sent his brother, the insured, monthly

checks to the address of his niece Mary Mathis, in Cincinnati. These checks came regularly and the insured always came to the home of his niece to get them,—that is, until sometime prior to May 1, 1941. After this, the monthly checks continued to be sent by Darragh Ligon, Sr., to Mary Mathis to her Cincinnati address, and as the insured never appeared again to claim them, she returned them to her uncle at Greenwood.

Mary Mathis stated in her testimony that she last saw Dendy Ligon about the first of May, 1941. That in June, 1941, after her uncle ceased to visit her home, she instituted a thorough search for him, She appealed to the police force in Cincinnati, who attempted to find him but without success. For a considerable length of time before he disappeared, he had been in a poor state of health, could do no regular work, but was employed occasionally on odd jobs.

The police records in Cincinnati, as testified to by the supervisor of the police records, showed that Dendy Ligon had been arrested on various charges prior to May 1, 1941. He was arrested four times or more between May 8, 1940 and March 27, 1941. The charges preferred against him included vagrancy, selling denatured alcohol, unlawful possession of intoxicating liquors, and disorderly conduct. The last arrest was made on March 27, 1941. On the occasion of his last arrest, charged with vagrancy, Ligon, the insured, was fined $25.00 and costs, and was sent to the work house to serve out his fine, for a period of eighteen days. After this date the police records are silent as to Dendy Ligon.

The insured's niece, Mary Mathis, testified that according to her knowledge, he had never left Cincinnati from the time he came there in 1925 to work for the Chevrolet Company. He not only suddenly stopped going to the home of his niece to get his mail and checks from his relatives in Greenwood, but he also stopped visiting Blackmon's Cafe, a restaurant in the negro section of Cincinnati which he had visited daily for two years prior to May 1, 1941, to get a sandwich and a

drink. Four witnesses, including two bartenders at Blackmon's Cafe, testified that the section of the city where Ligon lived in various rooming houses, was a rough place, and was known as the "Black Gap." The owner of Blackmon's Cafe testified that he would cash the insured's checks, but that he never saw him or cashed any checks after April, 1941.

Mary Mathis further testified that early in June, 1941, when the insured ceased coming to her home, she not only sought and obtained police investigation to discover him, but made personal inquires herself at the last rooming house where Ligon stayed, and at all the local hospitals. She also interviewed the owner and bartenders at Blackmon's Cafe, but they had not seen him since April, 1941. The respondent, Metropolitan Life Insurance Company, in 1943, after hearing from appellant's counsel that Ligon was missing and presumably dead, made search for him through their inspector. The inspector interviewed the owner of Blackmon's Cafe and the bartenders, and various other sources of possible information, including the records in the city police court. The inspector found nothing going to show that Dendy Ligon was alive after May 30, 1941, except a statement given by the inspector as a witness, that Blackmon, the owner of the Cafe, told him that he had seen Dendy Ligon alive in the month of August, .1941. Blackmon emphatically denied making the statement attributed to him. Except for this statement, there is no conflict in the evidence concerning the time when the insured suddenly disappeared from the sight of all who knew him, and has never been seen or heard from since, although seven years had elapsed since his disappearance when this case was tried.

We have repeatedly held that where a person has disappeared and has not been heard of for a period of seven years by those persons who would ordinarily hear from him and be in contact with him, there arises a *prima facie* proof of death, and if this proof is not rebutted, it becomes conclusive. The presumption of death from seven

years' unexplained absence prevails over the presumption of the continuance of life. *Day v. Day,* 216 S. C. 334, 58 S. E. (2d) 83; *In re Duncan's Estate,* 190 S. C. 211, 2 S. E. (2d) 388.

Whether the death of a person not heard from in seven years occurred at the beginning or end of that period is a matter to be determined upon the facts and circumstances of each particular case, the burden of proof being upon him whose interest it is to fix the death prior to the expiration of the seven years. *Corley v. Holloway,* 22 S. C. 380.

In civil cases, death may be proved by circumstantial evidence. To prove the death of a person at a particular time, the evidence need not be direct or positive, but it must be of such a character as to make it more probable that he died at a particular time than that he survived. *Free v. Life Insurance Co. of Virginia,* 176 S. C. 295, 180 S. E. 28; *Candy v. George,* 6 Rich. Eq. 103.

It is generally held that the death of an absent person before the expiration of seven years may be presumed or inferred from circumstances other than exposure to some specific peril, or to some immediate danger calculated to destroy life where such circumstances show an improbability of, or lack of motive for, a mere abandonment of his home. 16 Am. Jur., Sec. 36, Page 13. Such circumstances include the character, habits, conditions, affections, attachments, prosperity, and objects in life of the absentee, which usually control the conduct of men and are the motives of their actions, and in view of which no reasonable explanation can be given for his absence. The age as well as the habits and health of the absentee may also be considered. *Free v. Life Ins. Co. of Virginia,* 176 S. C. 295, 180 S. E. 28; *Huckabee v. Life Insurance Co. of Virginia,* 176 S. C. 279, 180 S. E. 32.

In the case at bar, we are of opinion that the facts and circumstances as disclosed by the evidence, made a jury question as to the time of the death of the in-

sured, Dendy Ligon. In the first place, it is a question for the jury as to whether or not the insurance policy on the life of Dendy Ligon expired on March 2, 1941, carried to that date by the last premium payment, or whether it was cancelled on May 31, 1941, as shown by a letter in evidence from the respondent insurance company.

A plaintiff is not required to establish beyond a rea-.. sonable doubt the fact of death of the insured prior to the date of default, but merely to furnish proof which tends to show that fact, or to make it appear to the jury more probable or credible than otherwise; that is to say, by the preponderance of the evidence.

We have here a case of a negro man advanced in years who had been living in Cincinnati from 1925 until his disappearance about May 1, 1941. He had received a physical injury in 1938 or 1939, and was first committed to the State Hospital in Columbia, South Carolina, and then to a mental hospital in Cincinnati, where he received treatment for several months. He was in a poor state of health, and it may be inferred from the record that he was practically destitute and lived the life of a vagabond after leaving the employment of the Chevrolet Company in 1938 or 1939. His main source of livelihood consisted of monthly checks received from his brother, Darragh Ligon, Sr., who was his Committee, from Greenwood, South Carolina. According to the testimony, his income was eked out by obtaining odd jobs. And the police records show that he was constantly in trouble, apparently from his effort to sell liquor unlawfully.

The insured could have had no stronger motive, if living, and to continue living, than by going to his niece's home to get his monthly checks. And from the fact that he ceased his visits there after May 1, 1941, together with the other circumstances, it may be inferred that something drastic and of a most unusual nature had taken place.

Under the facts here, when we consider those things which usually control the conduct of men, it was for the jury to say

whether the insured's sudden disappearance prior to May 1, 1941 could be presumed to infer death; and it was error in the lower court not to so hold.

Respondent cites and relies upon the case of *Price v. Life Insurance Co. of Virginia,* 173 S. C. 407, 176 S. E. 312. In that case, the evidence showed that the insured left his home in Columbia, South Carolina, on September 4, 1922, and that nothing had been heard of him since, after the lapse of more than seven years. According to the testimony, he went away for a definite purpose, that of purchasing a tract of land near Blythewood, where he was born and reared, and where some of his relatives resided. He was 43 years of age, had been married 22 years, and it was shown that he took with him $500.00 in cash which he and his wife had saved from their daily labor from year to year. He was a hard-working man, made a good living for his wife and family, and manifested a love for his wife and children. On the day he left his home he told his wife he would not return that night but would spend the night with his uncle. When he left he got into a buggy with a negro man, at which time he told his son that he was going out to the country.

The court held that this testimony was sufficient to prove his disappearance, but that it did not prove what time Mr. Price died within seven years from September, 1922. This conclusion was based largely upon the following statement made by the court: "We agree with appellant's contention that there is an absence of any testimony tending to show that the insured (Price) expected or was exposed to any danger at that time or that he expected to go upon any pro-longed journey, and, therefore, it cannot be assumed that he died at that time."

In our opinion, the factual situation in the *Price case* is entirely different from the detailed testimony which we have narrated in the case at bar. In addition to this, under the modern trend of authority the death of an absent person be-fore the expiration of seven years may be presumed or in-

ferred from circumstances other than exposure to specific peril. *Free v. Life Ins. Co. of Virginia, supra; Huckabee v. Life Ins. Co. of Virginia, supra.* See Annotations, 34 A. L. R. 1389; 61 A. L. R. 1327; 75 A. L. R. 630.

The issue arose on the pleadings, as to whether the beneficiary furnished to the insurance company proof of death. In its answer, the insurance company alleged that no notice or proof of the alleged death of Dendy Ligon was given or furnished in accordance with the terms and provisions of the insurance contract, and on this ground denied liability. The provision referred to appears in the master policy or group policy, in Section 1, where it is stated: "Upon receipt by the company of due notice and proof in writing of the death of an employee while insured hereunder * * * the company will pay * * *."

In its brief, counsel for respondent concedes that notice of the claim was given to the insurance company, but states that on trial the issue was whether sufficient proof of death had been made.

The record shows that notice of the claim was given to the company as early as December, 1941, and in a letter from the company to appellant's attorney, he was requested in 1943 to furnish what proof he could with reference to the death of Dendy Ligon. By letter of October 6, 1943, plaintiff's attorney sent to the insurance company four affidavits, and their receipt by the company is not denied. While these affidavits contain some hearsay matter, they furnished to the company all the information obtainable at that time concerning the disappearance and presumed death of Dendy Ligon prior to May 1, 1941. The competent portions of these affidavits should have been admitted in evidence, because it was all the "proof in writing" which could be obtained at that time of the death of the insured.

The purpose of a proof of death is to enable the insurer to form an intelligent estimate of its rights and liabilities under its policy. Unless fixed by the policy,

154

there is no precise standard to which a proof must conform. The policy in this case does not necessitate direct evidence of death, or proof of actual death, but only such evidence thereof as is reasonably available. The insurance company must know that, in disappearance cases, the means of proof of death are necessarily limited.

The affidavits above referred to were offered in evidence at the trial, and as stated, competent portions thereof should have been admitted. They constituted as much proof of death as it was possible for appellant to give. 29 Am. Jur., Sec. 1104, Page 827; 29 Am. Jur., Sec. 1107, Page 831.

The master policy or group policy issued by the respondent, carries this provision in Section 10: "An employee's certificate and the benefits provided hereunder are non-assignable". As hereinabove stated, Mary Mathis, the niece of the insured, was named as beneficiary on December 30, 1939. There was no further change of beneficiary effected until after the time of the disappearance of Dendy Ligon. In October, 1943, two and a half years after his disappearance, Mary Mathis executed unto Darragh Ligon, Sr., an instrument by which she assigned "All of my right, title and interest in and to the said policy of insurance." This assignment was offered by the plaintiff at the trial as one of the exhibits.

The trial court held, we think erroneously, that the foregoing assignment was ineffective and contrary to the provisions of the policy. The provision inserted in the master policy obviously refers to a situation where the insured undertakes to assign his policy of insurance during his lifetime. In our opinion, such a restriction in the insurance policy is not intended to cover a case where the loss has already occurred and where the thing which is being assigned is a claim for a loss. It will be noted that the policy does not state that it might not be assigned after a loss has occurred.

It is well stated in 29 Am. Jur., Sec. 506, Page 410:
■ "General stipulations, in policies, prohibiting assignment thereof, except with the insurer's consent or upon giving some notice, or like conditions, have universally been held to apply only to assignments before loss, and, accordingly, not to prevent an assignment after loss or death, or the maturity of the policy, of the claim or interest in the insurance money then due * * *."

We agree with the holding of the trial court that appellant cannot recover under the extended death benefit of the policy. There is no sufficient showing in the testimony of compliance by appellant with the provisions of the "extended death benefit" which is printed on the certificate of insurance. We will not attempt to set forth in full these provisions relating to total disability as a result of bodily injury or disease.

There is also a very serious question as to whether or not under the pleadings, any issue was properly raised as to disability benefits and total and permanent disability. In our opinion, the trial court correctly held that this issue was not made by the pleadings.

It follows from what we have said, that the case must be remanded for a new trial.

Judgment reversed.

STUKES, TAYLOR and OXNER, JJ., and L. D. LIDE, A. A. J., concur.