JUSTICE JAMES :
**447 Palmetto Mortuary Transport, Inc. (Palmetto) sued Knight Systems, Inc. and Robert Knight (collectively, Knight) for breach of an asset purchase agreement executed in connection with the sale of Knight's mortuary transport business to Palmetto. A special referee found Knight breached the agreement by violating both a non-compete covenant and an exclusive sales provision contained in the agreement. Knight appealed, and the court of appeals reversed and remanded, holding the 150-mile territorial restriction in the non-compete **448 covenant was unreasonable and unenforceable. Palmetto Mortuary Transp., Inc. v. Knight Sys., Inc. , 416 S.C. 427, 786 S.E.2d 588 (Ct. App. 2016). We reverse the court of appeals and hold that under the facts of this case, the territorial restriction in the non-compete covenant was reasonable and enforceable. We also find Knight's additional sustaining grounds to be without merit and therefore reinstate the special referee's order.
FACTUAL AND PROCEDURAL HISTORY
Founded in the 1980s, Knight began its operations as a mortuary transport business;
*727 however, it eventually expanded to include the manufacturing and sale of body bags. In 2006, Knight decided to sell the mortuary transport portion of its business and approached a broker for assistance. In October 2006, Donald and Ellen Lintal (the CEO and CFO of Palmetto) met with a broker to discuss the purchase of Knight's mortuary transport business. From November 2006 to January 5, 2007, the parties and their agents-including brokers, accountants, and attorneys-negotiated the terms of an asset purchase agreement (the Agreement). During negotiations, Mr. Knight expressed to Mr. Lintal his desire to "get out of the business."
On January 5, 2007, Knight and Palmetto executed the Agreement. Pursuant to the Agreement, Knight sold various tangible assets, goodwill, and customer accounts-including body removal service contracts with Richland County, Lexington County, and the University of South Carolina-to Palmetto in exchange for $590,000.[1] The Agreement included a provision (Exclusivity Provision) requiring Palmetto to purchase body bags from Knight for ten years and requiring Knight to sell body bags to Palmetto for ten years. The Exclusivity Provision became a central issue in the dispute between the parties.
A ten-year, 150-mile non-compete covenant was also executed and was included as an exhibit to the Agreement. Although the non-compete covenant restricted Knight from providing **449 mortuary transport services within a 150-mile radius of Lexington County, it placed no restrictions on Knight's ability to continue its body bag manufacturing business. The non-compete covenant also provided that "a breach by [Palmetto] of [the Agreement] or such other documents ancillary thereto, shall constitute a breach of [the non-compete covenant] and shall release [Knight] from any and all restrictions hereunder."
Mr. Lintal testified the 150-mile territorial restriction extending from Lexington County was included to ensure Knight would not compete with Palmetto in South Carolina for ten years. Mr. Lintal acknowledged that at the time Palmetto purchased the transport business, Knight provided services primarily in Richland and Lexington County. Mr. Lintal testified that at the time the Agreement was executed, "We didn't know where the business was actually going to-what we were going to-if we were going to try to expand it at different locations. We wanted to keep our options open if it was doable."
In 2011, Palmetto still held the mortuary transport services contract with Richland County pursuant to the Agreement. Since the original five-year term between Palmetto and Richland County was expiring, Richland County issued a Request for Proposal (RFP) seeking mortuary transport service for the succeeding five years. Palmetto timely submitted its response to the RFP.
As noted above, the Exclusivity Provision required Palmetto to purchase body bags exclusively from Knight for ten years. From 2007 through 2011, Palmetto purchased over $45,000 worth of body bags from Knight. Palmetto had also purchased body bags from manufacturers other than Knight in the amount of $884.97. These purchases consisted of thirty-one infant bags ($192.75), four extra-large body bags ($213.72), six heavy duty body bags ($208.50), and six water-retrieval bags ($270.00). Knight became aware of the purchase of infant bags in 2009 or 2010 and immediately considered the purchase to be a breach of the Agreement, but did not confront Palmetto about the supposed breach for almost two years. Mr. Knight testified he did not become aware of the other purchases until discovery was exchanged after litigation began.
**450 Palmetto believed the Exclusivity Provision did not require Palmetto to purchase either infant or extra-large bags from Knight. Palmetto agreed it had breached the Exclusivity Provision in purchasing heavy *728 duty and water-retrieval bags from other manufacturers but argued this breach was not material. It argued the remedy for this breach was not cancellation of the Agreement, but rather money damages in the amount of $478.50, the sum it paid other manufacturers for heavy duty and water-retrieval bags. Knight argued the Exclusivity Provision required Palmetto to purchase all of its body bags from Knight and claimed the breach was material and nullified all terms and conditions of the Agreement, including the non-compete covenant.
On June 16, 2011, one day prior to the deadline for responses to the RFP, Mr. Knight recorded a conversation he had with Mr. Lintal. During the conversation, Mr. Knight accused Palmetto of purchasing infant body bags from other manufacturers. Mr. Lintal replied he did not believe his purchase of these body bags from other manufacturers was "significant," and he noted he did not believe "it was anything to break [the Agreement]." As noted above, Mr. Knight was aware of Palmetto's supposedly illicit purchase of infant body bags for almost two years before he confronted Mr. Lintal.
Following his conversation with Mr. Knight, Mr. Lintal suspected Knight was going to bid against Palmetto on the Richland County contract. Mr. Lintal's suspicion was correct-Mr. Knight submitted his own RFP the very next day. Even though Knight had received $590,000 for the sale of the business and an extra $45,000 in body bag purchases from Palmetto, Mr. Knight testified, "I didn't want to get back in the business. I was forced to. ... I felt like if I didn't take action at that time, I was going to be left out in the cold." After the RFP deadline passed, Mr. Knight contacted the Richland County Procurement Office and told a Richland County official that Knight should be awarded the contract because it was the sole provider of odor-proof body bags-a requisite of the RFP.[2] Although Palmetto's response to the **451 RFP contained the lowest price for services and received the highest total points from the Richland County Procurement Office, Richland County awarded the contract to Knight the next month.
Palmetto sued Knight for breach of the Agreement, alleging Knight violated: (1) the non-compete covenant prohibiting Knight from providing mortuary transport services for ten years within the 150-mile territorial restriction and (2) the Exclusivity Provision, based upon Knight's refusal to supply Palmetto with body bags. Knight answered and counterclaimed, alleging the non-compete covenant was unenforceable because it contained an unreasonable territorial restraint, contained an unreasonable time restriction, and was not supported by adequate consideration. Knight also alleged any breach of the non-compete covenant was excused because Palmetto first materially breached the Exclusivity Provision by purchasing body bags from other manufacturers.
The case was tried before a special referee. The special referee found the non-compete covenant was reasonably limited in time and territorial scope and was supported by valuable consideration. The special referee found Knight breached the Agreement by violating the non-compete covenant and by refusing to sell body bags to Palmetto. The special referee determined Palmetto's purchase of heavy duty and water-retrieval body bags from other manufacturers, although a breach, did not constitute a material breach of the Agreement such that Knight was excused from performance of its contractual obligations. The special referee ordered Knight to pay (1) attorneys' fees and (2) damages of $373,264.54 in lost profits resulting from the wrongful competition with Palmetto. The special referee issued a permanent injunction requiring Knight to comply with the terms of the non-compete covenant for a term of five years and seven months following the date of his order, but allowing Knight to complete its *729 performance of the 2011 mortuary transport contract with Richland County. Finally, the special referee awarded Knight $478.50 in damages for Palmetto's breach of the Agreement. **452 Knight appealed the special referee's order to the court of appeals, arguing the special referee erred in finding (1) the territorial restriction in the non-compete covenant was reasonable and enforceable, (2) the territorial restriction was supported by independent and valuable consideration, (3) the non-compete covenant was not void as against public policy, and (4) the non-compete covenant was not voided by Palmetto's breach of the Exclusivity Provision. Palmetto Mortuary Transp., Inc. v. Knight Sys., Inc. , 416 S.C. 427, 429-30, 786 S.E.2d 588, 589 (Ct. App. 2016). The court of appeals reversed and remanded, holding the non-compete covenant's 150-mile territorial restriction was unreasonable and unenforceable.[3] Id. at 437, 786 S.E.2d at 593. Because South Carolina does not follow the "blue pencil rule" and because the non-compete covenant does not include a "step-down provision," the court of appeals found it would be impermissible to redraw the Agreement to include a smaller territorial restriction. Id. at 436, 786 S.E.2d at 592. This Court granted Palmetto's petition for a writ of certiorari to review the court of appeals' decision.
STANDARD OF REVIEW
An action for a breach of contract is an action at law. Milliken & Co. v. Morin , 399 S.C. 23, 30, 731 S.E.2d 288, 291 (2012). "Whether a contract is against public policy or is otherwise illegal or unenforceable is generally a question of law for the court." Id. (quoting 17B C.J.S. Contracts § 1030 ). We review questions of law de novo. Id.
DISCUSSION
I. Territorial Restriction of the Non-Compete Covenant
Palmetto argues the court of appeals erred in holding the territorial restriction in the non-compete covenant was unreasonable. We agree.
**453 A. Applicable Law
"A covenant not to compete is enforceable if it is not detrimental to the public interest, is ancillary to the sale of a business or profession, is reasonably limited as to time and territory, and is supported by a valuable consideration." S.C. Fin. Corp. of Anderson v. W. Side Fin. Co. , 236 S.C. 109, 119, 113 S.E.2d 329, 334 (1960). "The reason why such covenants are held to be unenforceable is that unless they meet certain criteria, they constitute a restraint upon trade which is against public policy." Somerset v. Reyner , 233 S.C. 324, 330, 104 S.E.2d 344, 347 (1958).
In Reeves v. Sargeant , 200 S.C. 494, 496, 21 S.E.2d 184, 185 (1942), Sargeant operated a successful photography business in Richland County. For $3,500, Reeves purchased the business, together with all of its assets, goodwill, and the exclusive right to use the name "Sargeant Photo Company." Id. The contract required Sargeant to "never again enter into the photograph business ... in Richland County." Id. at 497, 21 S.E.2d at 186. Following the execution of the contract, Sargeant began competing against Reeves, and Reeves sued Sargeant. Id. at 498, 21 S.E.2d at 186. "[Sargeant] successfully contended in the lower court that the contract being one in partial restraint of trade is void and against public policy, because the duration of the restraint upon the defendant is unreasonable, in that it is without time limit." Id.
We disagreed and stated, "The test which generally is laid down by which it may be determined whether a contract is reasonable is whether it affords a fair protection for the interests of the party in whose favor it is made, without being so large in its operation as to interfere with the interest of the public." Id. at 498-99, 21 S.E.2d at 186. We continued:
*730 In determining whether a contract in partial restraint of trade is reasonable, the court will look to the whole subject matter of the contract, the kind and character of business, its location, the purpose to be accomplished by the restriction, and all circumstances which show the intention of the parties and which must have entered into the making of the contract. ... In the case before us, the restraint is limited as to space and territory, and is to run during the lifetime of the defendant. It is only as to the time feature that the **454 defendant objects. In determining whether a contract is reasonable in respect to the length of time during which the restriction is to run, as applied to a case like the one before us, it would seem that the fair and full protection of the business, good will and trade name which the vendee has purchased and paid for, may well be accepted as the test. It follows naturally that each case must be governed in the main by its own facts .
Id. at 501-02, 21 S.E.2d at 188 (emphasis added). We found the limitation did not go beyond what was necessary for the protection of Reeves in the prosecution of the business he purchased and was, therefore, reasonable and enforceable. Id. at 504, 21 S.E.2d at 189.
In Somerset v. Reyner , 233 S.C. 324, 327, 104 S.E.2d 344, 345 (1958), Somerset owned a profitable shop in the Five Points area of Columbia specializing in the sale of sterling silver. Ninety-five percent of his sales were in the Greater Columbia area. Id. at 328, 104 S.E.2d at 345. Somerset decided to sell his business and entered into an agreement for Reyner to buy the business. Id. The agreement included a non-compete covenant prohibiting Somerset from engaging in the silver or jewelry business in South Carolina for twenty years. Id. at 328, 104 S.E.2d at 346. The contract was prepared by Reyner or his attorney, and Somerset was not represented by counsel during the transaction. Id. at 329, 104 S.E.2d at 346. Subsequent to the sale, Somerset was employed as manager of the shop, but Reyner terminated Somerset several months later. Id. Somerset brought a declaratory judgment action, arguing the territorial restriction in the non-compete provision was unreasonable-making the non-compete covenant void. Id. at 327, 104 S.E.2d at 345. The trial court agreed. Id.
We affirmed the trial court and explained a non-compete covenant entered into in conjunction with the sale of a business and its good will is valid if: (1) supported by valuable consideration, (2) reasonably limited as to time, and (3) reasonably restricted as to the place of territory. Id. at 329, 104 S.E.2d at 346. We stated:
We shall first determine whether the covenant under consideration is necessary in its full extent for the protection of the covenantee's business or good will. If not, the territorial **455 scope of the restraint is unreasonable and no inquiry need be made as to the presence or absence of other necessary requirements.
Id. at 330, 104 S.E.2d at 346. Because the store's business came almost entirely from the Greater Columbia area, we found no rational basis for the statewide territorial restraint and voided the covenant. Id. at 330, 104 S.E.2d at 347. We found that to protect Reyner's interest in the business, it was not necessary to prohibit Somerset from engaging in similar business in "Charleston, Spartanburg, Greenville[,] or numerous other cities in South Carolina." Id. at 330, 104 S.E.2d at 346. Reyner argued Somerset was estopped from attacking the validity of the covenant because Somerset informed Reyner that the entire state could be included in the territorial restriction because he-Somerset-had no intention of returning to this type of business. Id. at 330, 104 S.E.2d at 347. We rejected that argument, noting "[t]he general rule is that an agreement void as against public policy cannot be rendered valid by invoking the doctrine of estoppel." Id. Additionally, we declined to apply the "blue pencil test" to redraw a reasonable territory for the restriction because the covenant was "clearly indivisible" and "furnishe[d] no basis for dividing this territory." Id. at 332, 104 S.E.2d at 348. We explained, "We cannot make a new agreement for the *731 parties into which they did not voluntarily enter." Id.
B. Analysis
The court of appeals analogized the instant case to Somerset and found the territorial restriction was unreasonable. The court of appeals found that at the time the Agreement was executed, Knight's mortuary transport business only conducted business in Richland and Lexington counties and found Palmetto's tentative desire to expand its business throughout the state-without more evidence of definitive planning, acquisitions, or other overt acts-did not support a finding that the restriction was reasonable. Additionally, the court of appeals found Knight's intention of not returning to the mortuary transport business was an irrelevant factor in determining whether the territorial restriction was reasonable.
We disagree with the court of appeals. While Somerset and the instant case have some factual similarities, the court **456 of appeals too narrowly focused on these similarities and failed to consider the facts of the instant case as a whole. See Reeves , 200 S.C. at 502, 21 S.E.2d at 188 ("It follows naturally that each case must be governed in the main by its own facts."). Under Reeves , an analysis of the reasonableness of a territorial restriction in a non-compete covenant must take into account relevant facts surrounding the making of the agreement. See id. at 501, 21 S.E.2d at 188 (noting that in determining whether a non-compete covenant is reasonable, a court will consider: (1) the whole subject matter of the contract; (2) the kind and character of the business; (3) location; (4) the purpose to be accomplished by the restriction; and (5) all circumstances which show the intention of the parties and which must have entered into the making of the contract). We will now apply these considerations to the territorial restriction in the non-compete covenant agreed upon by Palmetto and Knight. We must note that consideration (4), the purpose to be accomplished by the restriction, is intertwined with all other considerations we address.
As for the subject matter of the contract, we stress the non-compete covenant between Knight and Palmetto arose out of the sale of a business between two sophisticated parties. Non-compete covenants executed in conjunction with the sale of a business should be scrutinized at a more relaxed level than non-compete covenants executed in conjunction with employment contracts. See Alston Studios, Inc. v. Lloyd V. Gress & Assocs. , 492 F.2d 279, 284 (4th Cir. 1974) (citing Virginia law and stating, "greater latitude is allowed in determining the reasonableness of a restrictive covenant when the covenant relates to the sale of a business than in those ancillary to an employment contract"); American Hot Rod Ass'n, Inc. v. Carrier , 500 F.2d 1269, 1277 (4th Cir. 1974) (citing North Carolina law and noting non-compete covenants in employment contracts are scrutinized more rigorously than similar covenants incident to the sale of a business). Non-compete covenants executed in the context of an employment contract are generally disfavored and are strictly construed against an employer. Milliken , 399 S.C. at 31, 731 S.E.2d at 292. The probability of unequal bargaining power that may exist between an employer and employee is significantly reduced when the restriction arises in the context of a sale of a **457 business between two sophisticated parties. Also, a non-compete covenant executed pursuant to the sale of a business allows the opportunity for a seller to capitalize on the disposition of the business's goodwill and bargain for a higher price. See Day Companies v. Patat , 403 F.2d 792, 795 (5th Cir. 1968).
The Agreement involved the somewhat complex sale of Knight's mortuary transport business to Palmetto for $590,000. Both Palmetto and Knight are sophisticated parties and were represented by legal counsel throughout the negotiation and execution of the Agreement. Knight necessarily considered the restrictions in the non-compete covenant in making his decision to enter into the Agreement. The non-compete covenant was integral to Palmetto's decision to enter into the Agreement. Mr. Lintal testified about *732 Mr. Knight's "strong reputation" in the business and stated, "[The non-compete covenant] was very important to us because without the non-compete, we wouldn't have bought the business." Further, the non-compete covenant specifically provided, "[Knight] has agreed to provide such covenants as set forth herein as a material inducement to [Palmetto] to enter into and close the Purchase Agreement." (emphasis added). It is clear the non-compete covenant was a centerpiece of the Agreement and that both Palmetto and Knight bargained for and intended to benefit from its terms.
While the non-compete covenant effected a partial restraint of trade by limiting Knight's ability to provide mortuary transport services, this restraint was offset by Knight's continuation of its body bag manufacturing business and the Exclusivity Provision requiring Palmetto to purchase body bags from Knight throughout the term of the non-compete covenant. Indeed, Palmetto purchased approximately $45,000 worth of body bags from Knight before the current controversy arose. The Agreement did not prohibit Knight from continuing to sell bags to other customers. It is clear that both Knight and Palmetto carefully considered and calibrated their options and best interests in striking their bargain.
Under Reeves , we must consider the kind and character of the business and the location of the business. The territorial restriction in this case consisted of a 150-mile radius **458 surrounding Lexington County. At the time Palmetto purchased Knight's business, the business predominantly serviced Richland and Lexington counties. However, focusing only upon the existing territory of Knight's business and Palmetto's lack of concrete plans for geographical expansion ignores the kind and character of the business. A mortuary transport business necessarily involves mobility of services, and expansion into other areas of South Carolina is certainly foreseeable. This is not a brick and mortar 1950s local retail business as was the case in Somerset . Palmetto, a sophisticated buyer, saw the opportunity for expansion outside Knight's existing business area and thus negotiated the Agreement with Knight, a sophisticated seller, to protect its interests by implementing the 150-mile territorial restriction. At his deposition, Mr. Lintal testified that since the execution of the Agreement, Palmetto has added new customers and "on occasion" provides services for customers outside of the Columbia and Lexington area.
After considering the Agreement as a whole, and after giving the non-compete covenant the more relaxed scrutiny it requires, we find the territorial restriction was not greater than what was essential for a reasonable protection of the rights purchased by Palmetto. See Metts v. Wenberg , 158 S.C. 411, 415, 155 S.E. 734, 735 (1930) (noting it is generally held that a non-compete is reasonably restricted as to the place or territory "where the time is not more extended or the territory more enlarged than essential for a reasonable protection of the rights of the purchasing party").
II. Knight's Additional Arguments
Knight presents two additional sustaining grounds for this Court's consideration if this Court were to find error with the court of appeals' conclusion that the non-compete covenant's territorial restriction was unreasonable.[4] Because we find the **459 court of appeals erred in concluding this non-compete covenant *733 was unenforceable, we will address Knight's additional arguments.
A. Public Policy
Knight argues the non-compete covenant-restricting competition between potential competitors for public contracts-is invalid and void as against public policy. Although there may be situations in which this Court may find a restriction of competition between potential competitors for public contracts to be void as against public policy, this case does not rise to such a level.
Determining whether a contract is void as against public policy is generally a question of law for the Court. See Milliken , 399 S.C. at 30, 731 S.E.2d at 291. Here, there is no evidence Knight and Palmetto colluded or purposefully undertook an act to affect the public procurement process. The non-compete covenant neither restricted the public's ability to bid on public contracts nor guaranteed Palmetto would obtain any public contract for mortuary transport services within the defined territory. We also note Mr. Knight professed his desire to "get out of the [transport] business." The protection of Palmetto's interest in not having Knight compete for public contracts following its purchase of Knight's business is grounded in sound business practices and does not violate public policy. We decline to create a blanket rule that a non-compete covenant that restricts competition between potential **460 competitors for public contracts is invalid and void as against public policy.
B. Palmetto's Breach of the Agreement
Knight argues Palmetto first breached the Agreement by purchasing body bags from other manufacturers, thereby nullifying all terms and conditions-including the non-compete covenant-contained in the Agreement. Although it is clear Palmetto breached the Agreement, we agree with the special referee's conclusion that Palmetto's breach was not material; consequently, the special referee properly concluded Palmetto's breach did not nullify all terms and conditions contained in the Agreement.
1. Interpretation of the Exclusivity Provision
"The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." Schulmeyer v. State Farm Fire & Cas. Co. , 353 S.C. 491, 495, 579 S.E.2d 132, 134 (2003). "If the contract's language is clear and unambiguous, the language alone determines the contract's force and effect." Id. "When a contract is unambiguous a court must construe its provisions according to the terms the parties used; understood in their plain, ordinary, and popular sense." Id.
The Exclusivity Provision stated:
3.4.8 [Knight]'s Related Business. Knight, through his related body bag business (the "Related Business"), shall provide to [Palmetto] body bags at a discounted rate and [Palmetto] shall for the term of the non-compete agreement buy all their body bags from [Knight]. Below are current charges for different types of body bags. The prices noted below shall not be increased by more than ten percent (10%) in any calendar year.
Heavy Duty body bags: $20.00
Lightweight body bags: $8.00
Odor-Proof body bags: $50.00
Water-Retrieval body bags: $30.00
Knight claims Palmetto breached the Exclusivity Provision by purchasing $884.97 worth of body bags from other manufacturers.
*734 **461 Palmetto claims it was required to buy from Knight only those types of bags listed in the above provision and argued its breach of the Exclusivity Provision was only in the amount of $478.50. The special referee agreed with Palmetto and awarded damages to Knight in the latter amount. We agree with the special referee.
2. Materiality of Palmetto's Breach
"A breach of contract claim warranting rescission of the contract must be so substantial and fundamental as to defeat the purpose of the contract." Brazell v. Windsor , 384 S.C. 512, 516-17, 682 S.E.2d 824, 826 (2009). "Thus, a rescission will not be granted for a minor or casual breach of a contract, but only for those breaches which defeat the object of the contracting parties." Rogers v. Salisbury Brick Corp. , 299 S.C. 141, 143-44, 382 S.E.2d 915, 917 (1989).
The special referee found Palmetto breached the Exclusivity Provision by purchasing $478.50 worth of body bags from manufacturers other than Knight. However, the special referee found this breach was not material and did not nullify Knight's obligation to honor the non-compete covenant. The special referee concluded Knight was entitled to $478.50 in damages as a result of Palmetto's breach.
We hold Palmetto's conduct did not constitute a material breach of the Agreement.[5] Palmetto breached the Agreement **462 by purchasing $478.50 worth of body bags from outside manufacturers. In comparison, Palmetto purchased $45,000 worth of body bags from Knight prior to the current controversy and paid Knight $590,000 to purchase Knight's mortuary transport business. As additional support for the special referee's finding that Palmetto's breach was not material, we again note Knight knew of Palmetto's supposedly illicit purchase of infant body bags but sat on the information for approximately two years and did not confront Palmetto about the breach until the deadline for bidding on the Richland County contract was imminent.
Knight argues the special referee erred in focusing on the dollar amount of the breach because the appropriate focus is on "the essential nature of the term breached." Knight relies on Brazell , where we held a trial court erred in refusing a seller's demand for rescission after a buyer withheld $2,000 of the $550,000 purchase price of a home. 384 S.C. at 517, 682 S.E.2d at 827. The trial court found the buyer's withholding of such a small amount of the contract price was a nonmaterial breach as a matter of law. Id. We reversed and stated the trial court's error "stems from focusing on the dollar amount withheld in determining whether [buyer's] actions defeated the purpose of the contract and the objective of the contracting parties." Id. at 518, 682 S.E.2d at 827. Knight's reliance on Brazell is misplaced, as Brazell involved a contract for the sale of real estate, and this Court has noted "real estate contracts are unique and courts should evaluate the purpose of the real estate contract and the materiality of a breach in light of these differences." Id.
Evidence in the record supports the special referee's conclusion that Palmetto's breach was not material. Even if Palmetto's breach extended to the entire sum of $884.97 paid by Palmetto to other body bag manufacturers, our analysis would be the same.
*735 Knight also argues the non-compete covenant contains a termination clause[6] providing that "a breach by [Palmetto]" of **463 the Agreement would relieve Knight from further contractual obligations. Knight claims that any breach of the Agreement by Palmetto released it from the terms of the non-compete covenant. Therefore, Knight asserts, the termination clause does not require a material breach of the Agreement to permit Knight to terminate the non-compete covenant. We disagree. Only a material breach would relieve Knight from further contractual obligations. See Kiriakides , 312 S.C. at 275-76, 440 S.E.2d at 366-67 (holding a forfeiture for a trivial or immaterial breach of a commercial lease should not be enforced even though a lease between the parties specifically agreed "any breach" would give rise to the right of termination).
CONCLUSION
We hold the territorial restriction of the non-compete covenant is reasonable and enforceable, and we hold Knight's additional sustaining grounds are without merit. We therefore REVERSE the court of appeals and reinstate the special referee's order.
BEATTY, C.J., KITTREDGE, HEARN and FEW, JJ., concur.

The following purchase price allocations were set forth in the Agreement: $37,500 for "Furniture, Fixtures, & Equipment"; $1,000 for a "Non-Competition Covenant"; and $551,500 for "Customer Lists."

Palmetto had been purchasing odor-proof bags from Knight pursuant to the Agreement; however, Knight believed the Agreement requiring it to sell bags to Palmetto was no longer in effect because Palmetto had purchased body bags from other manufacturers. After Knight won the Richland County bid, Knight ceased selling body bags to Palmetto.

Citing Futch v. McAllister Towing of Georgetown, Inc. , 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999), the court of appeals declined to address Knight's remaining arguments since its holding regarding the territorial restriction of the non-compete covenant was dispositive of the appeal.

Although not raised to this Court as an additional sustaining ground, at the court of appeals, Knight also argued the non-compete covenant's territorial restriction was not supported by independent and valuable consideration. The Agreement set forth the purchase price allocation of $1,000 for the non-compete covenant. Additionally, the non-compete covenant provided:
NOW, THEREFORE, in consideration of the foregoing premises, the promises set forth herein, the consideration of $1,000.00 specifically allocated to this Agreement in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, [Knight] and [Palmetto], intending to be legally bound, hereby agree and covenant as follows[.]
We affirm the special referee's conclusion that the non-compete covenant was supported by independent and valuable consideration. See Metts , 158 S.C. at 415, 155 S.E. at 735 (providing non-compete agreements must be supported by valuable consideration); Lowery v. Callahan , 210 S.C. 300, 304, 42 S.E.2d 457, 458 (1947) ("When the consideration agreed upon [in a contract] is something of value, the courts will generally, in the absence of fraud, coercion, and undue influence, and if the parties are competent, not avoid the [contract] on the ground of the inadequacy of the consideration ... for the contracting parties, and not the courts, must determine the quid pro quo.").

The special referee conducted an analysis under section 241 of the Restatement (Second) of Contracts, which this Court previously adopted when determining whether the breach of a commercial lease was material. See Kiriakides v. United Artists Commc'ns, Inc. , 312 S.C. 271, 276, 440 S.E.2d 364, 366-67 (1994) (adopting section 241 to determine whether a breach of a commercial lease was material, which sets forth the following circumstances as significant: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated by damages for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all of the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing). We see no reason not to apply these factors to the Agreement in this case.

The termination clause reads:
Breach of the Purchase Agreement. Notwithstanding anything contained herein to the contrary, a breach by Buyer of the Purchase Agreement or such other documents ancillary thereto, shall constitute a breach of this Agreement and shall release Seller from any and all restrictions hereunder.
We note the termination clause does not provide that "any" breach by Palmetto relieved Knight from further contractual obligations.