# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

PCS Nitrogen, Inc., Appellant,

v.

Continental Casualty Company, Admiral Insurance Company, United States Fire Insurance Company, ACE Property & Casualty Insurance Company, Certain Underwriters at Lloyd's London, the Aviva Companies, the Winterthur Companies, Certain London Market Insurance Companies, Providence Washington Insurance Company (as Successor in Interest by way of Merger to Seaton Insurance Company, f/k/a Unigard Security Insurance, f/k/a Unigard Mutual Insurance Company), Berkshire Hathaway Specialty Insurance Company (f/k/a Stonewall Insurance Company), Lexington Insurance Company, Starr Indemnity & Liability Company (f/k/a Republic Insurance Company), First State Insurance Company, Century Indemnity Company (f/k/a California Union Insurance Company and Insurance Company of North America), Respondents.

Appellate Case No. 2016-001140

———————

Appeal From Charleston County
G. Thomas Cooper, Jr., Circuit Court Judge

———————

Opinion No. 5699
Heard March 12, 2019 – Filed December 18, 2019

———————

**AFFIRMED**

———————

William Howell Morrison, of Haynsworth Sinkler Boyd, PA, of Charleston; and Michael H. Ginsberg and Matthew R. Divelbiss, both of Pittsburgh, PA; all for Appellant.

Morgan S. Templeton, of Wall Templeton & Haldrup, PA, of Charleston, and Patrick F. Hofer, of Washington, D.C., for Respondent Continental Casualty Company; Robert Holmes Hood, Jr., of Hood Law Firm, LLC, of Charleston, and Robert F. Walsh, Patricia B. Santelle, and Thomas M. Going, of Philadelphia, PA, for Respondents United States Fire Insurance Company, ACE Property & Casualty Insurance Company, Century Indemnity Company (f/k/a California Union Insurance Company and Insurance Company of North America); R. Scott Wallinger, Jr. and Christian Stegmaier, of Collins & Lacy, PC, of Columbia, and John S. Favate and Michael Forino, of Springfield, NJ, for Respondent United States Fire Insurance Company; John Robert Murphy, Adam J. Neil, and Wesley Brian Sawyer, of Murphy & Grantland, PA, of Columbia, for Respondent Admiral Insurance Company; John Thomas Lay, Jr. and Laura Watkins Jordan, of Gallivan, White & Boyd, PA, of Columbia, and Helen Franzese, of Greensboro, NC, for Respondent Certain London Market Insurance Companies; Robert Michael Ethridge, of Ethridge Law Group, LLC of Mount Pleasant, and Wayne S. Karbal and Paul Parker, of Chicago, IL, for Respondent First State Insurance Company; John C. Bonnie, of Weinberg Wheeler Hudgins Gunn & Dial, LLC, of Atlanta, GA, for Respondent Lexington Insurance Company; Edward K. Pritchard, III, of Pritchard Law Group LLC, of Charleston, and Richard McDermott and Seth M. Jaffe, of Chicago, IL, for Respondent Certain Underwriters at Lloyd's London, Respondent the Aviva Companies, Respondent the Winterthur Companies, Respondent Berkshire Hathaway Specialty Insurance Company (f/k/a Stonewall Insurance Company), Respondent Starr Indemnity & Liability Company (f/k/a Republic Insurance Company); Elizabeth Janelle Palmer, of Rosen

Rosen & Hagood, LLC, of Charleston, and Harry Lee and Molly Woodson Poag, of Washington, DC, for Respondent Providence Washington Insurance Company (as Successor in Interest by way of Merger to Seaton Insurance Company, f/k/a Unigard Security Insurance, f/k/a Unigard Mutual Insurance Company); and Elizabeth Fraysure Fulton, of Hall Booth Smith, PC, of Mount Pleasant, for Respondents Certain Underwriters at Lloyd's London, the Aviva Companies, the Winterthur Companies, Starr Indemnity & Liability Company (f/k/a Republic Insurance Company).

---

**MCDONALD, J.:** In this insurance coverage dispute, PCS Nitrogen, Inc., argues the circuit court erred in finding it was not entitled to coverage rights under Columbia Nitrogen Corporation's (Old CNC) insurance policies issued by Respondents.[1] Specifically, PCS Nitrogen asserts the circuit court erred in finding it was not entitled to coverage rights under either a post-loss assignment of the rights under Old CNC's policies or as the corporate successor of Old CNC via de facto merger. We affirm the circuit court's order granting Respondents' motions for summary judgment.

**Facts and Procedural History**

From 1966 until 1972, Old CNC operated phosphate fertilizer plants in Charleston (the Charleston Site). From 1966 to 1985, Old CNC purchased primary and excess liability insurance policies from Respondents. Old CNC was the named insured on the policies, which stated, "The company will pay *on behalf of the insured* all sums which the insured shall become legally obligated to pay as damages because of . . . property damage . . . to which this insurance applies, *caused by an*

---

[1] The coverage determination is necessary due to the Fourth Circuit's affirmance of the South Carolina District Court's allocation of responsibility to PCS Nitrogen for Old CNC's superfund liabilities under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675 (2013). *See PCS Nitrogen, Inc. v. Ashley II of Charleston, LLC*, 714 F.3d 161 (4th Cir. 2013).

*occurrence . . . ."*[2]  (emphasis added).  The policies further provided, "Assignment of interest under this policy *shall not bind* the company *until its consent is endorsed hereon*."  (emphasis added).  Regarding actions against the insurer, the policies stated:

> No action shall lie against the company, unless, as condition precedent thereto, there shall have been full compliance with all of the terms of this policy, *nor until the amount of the insured's obligation to pay shall have been finally determined by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company*.
>
> Any person or organization or the legal representative thereof *who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy* to the extent of the insurance afforded by the policy.

(emphasis added).

In October 1986, Old CNC entered into a transaction with CNC Corp. (New CNC) in which it sold some of its assets to New CNC via an acquisition agreement; this transaction did not include the sale of the Charleston Site, which was sold to a third party in 1985.  In addition to some of Old CNC's assets, New CNC assumed some of Old CNC's liabilities as detailed in the acquisition agreement, which stated New CNC assumed liabilities related to the "acquired business."  The acquisition agreement defined the acquired business as "a business that produces and sells ammonia and nitrogen-based products."  Additionally, the acquisition agreement included a document titled "Assignment of Insurance Benefits," which was signed by Old CNC.  It stated,

> [B]y an Acquisition Agreement, dated as of October 31, 1986, entered into between [Old CNC] and [New CNC] . . . [Old CNC] has agreed to sell, convey, transfer,

---

[2] This language is from Continental Casualty's policy; however, the circuit court found all of Respondents' policies contained substantially similar language, and the parties do not dispute this finding.

and assign . . . all of [Old CNC]'s rights, proceeds and other benefits to and under all of [Old CNC]'s insurance policies . . . .

. . . .

[Old CNC] by these presents does hereby transfer and assign to [New CNC], its successors and assigns forever, all of [Old CNC]'s rights, title and interest, legal and equitable, *in the benefits and proceeds* under all of its insurance policies *to the extent the same may be transferred and assigned* . . . .

(emphasis added).

Prior to the closing of the asset sale, Old CNC composed a checklist of tasks that needed to be completed before or on the date of closing. The checklist included a section titled "Documents to be exchanged at Closing." This section stated the parties were to exchange "[a]ssignment of insurance policies *with the consent of the insurance companies endorsed thereon*." (emphasis added).

By letter dated December 6, 1986, the parties summarized the disposition of Old CNC's insurance policies at the closing on November 1, 1986. The letter stated,

[Old CNC] had insurance coverages as listed on the attached insurance policy schedule as of October 31, 1986. Most all of those policies were cancelled at closing . . . and pre-payments were refunded . . . . In these cases, new separate policies were issued to . . . [New CNC].

According to an attached schedule, New CNC obtained insurer consent and endorsement as to one liability policy[3] and cancelled the remaining policies.

Following the closing of the transaction, Old CNC filed a certificate of dissolution on November 19, 1986. Subsequently, New CNC changed its name to Columbia Nitrogen Corporation. On November 29, 1989, New CNC merged with Fertilizer

---

[3] This insurer is not a party to this appeal.

Industries, Inc., which changed its name to Arcadian Corporation on November 30, 1989.  In March 1997, Arcadian Corporation merged with PCS Nitrogen.

On September 26, 2005, Ashley II of Charleston, LLC, then owner of the Charleston Site, filed a declaratory judgment action against PCS Nitrogen in federal court, alleging PCS Nitrogen was liable for environmental remediation at the Charleston Site because New CNC acquired Old CNC's CERCLA liabilities in the 1986 transaction.[4]  The district court found PCS Nitrogen liable as a corporate successor to Old CNC under three theories, including a de facto merger theory. *PCS Nitrogen*, 714 F.3d at 172–73.  PCS Nitrogen appealed, and the Fourth Circuit affirmed the district court but only as to one theory.  *Id.* at 173–76.  Specifically, the Fourth Circuit held PCS Nitrogen was liable as a corporate successor to Old CNC because New CNC contractually assumed Old CNC's liabilities via the 1986 transaction.  *Id.* at 176.

On March 24, 2015, PCS Nitrogen filed an amended complaint in state court, seeking to enforce its coverage rights under Old CNC's liability insurance policies.[5]  Specifically, PCS Nitrogen asserted it was entitled to enforce these rights because (1) Old CNC contractually assigned its insurance rights to benefits and proceeds under the policies to New CNC and (2) it was the corporate successor to Old CNC via de facto merger.  Continental Casualty moved for summary judgment; the other carriers joined in this motion.  Following a hearing, the circuit court granted summary judgment to Continental Casualty and the other moving insurers.  The circuit court found none of the challenged policies were assigned to New CNC because Old CNC did not obtain consent from the insurers as required by the language of the policies and South Carolina law.  The court held that because there were no vested claims from prior actions against Old CNC at the time of the assignment, PCS Nitrogen was not entitled to anything under the policies, explaining post-loss assignments were only enforceable if assigning a chose in action.  The circuit court additionally found PCS Nitrogen was not entitled to Old CNC's insurance rights under a theory of de facto merger.  The

[4] In the federal litigation, PCS Nitrogen denied any liability as a corporate successor to Old CNC.  *PCS Nitrogen*, 714 F.3d at 171.

[5] PCS Nitrogen originally filed its complaint with the circuit court on January 18, 2011, after the district court held it was liable as Old CNC's corporate successor, but the circuit court stayed the action until PCS Nitrogen's appeal to the Fourth Circuit on the underlying allocation of CERCLA responsibility had concluded.

court explained the de facto merger theory was "legally untenable" because New CNC contractually assumed Old CNC's liabilities; therefore, it was an available party for any potential "creditors of the predecessor." PCS Nitrogen moved for reconsideration, which the circuit court denied.[6]

**Standard of Review**

"In reviewing a grant of summary judgment, our appellate court applies the same standard as the trial court under Rule 56(c), SCRCP." *Woodson v. DLI Properties, LLC*, 406 S.C. 517, 528, 753 S.E.2d 428, 434 (2014).

> Summary judgment is proper if, viewing the evidence and inferences to be drawn therefrom in a light most favorable to the nonmoving party, the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

*Id.* "We review questions of law de novo." *Callawassie Island Members Club, Inc. v. Dennis*, 425 S.C. 193, 198, 821 S.E.2d 667, 669 (2018). "Because the ambiguity of contracts and statutes are questions of law, we do not view the evidence in any particular light. Rather, we read the contract or statute to determine if its meaning is clear and unambiguous." *Id.*

**Law and Analysis**

**Assignment of Insurance Policies**

---

[6] Continental Casualty and certain other insurers simultaneously moved for summary judgment based on a "pollution exclusion" contained in the various policies. The circuit court issued a separate order on these motions, finding the question of the pollution exclusions moot in light of its grant of summary judgment on the carriers' assignment and corporate succession grounds. However, a South Carolina district court, affirmed by the Fourth Circuit, has already resolved the issue of the pollution exclusion adversely to PCS Nitrogen in a related matter. *See Ross Dev. Corp. v. PCS Nitrogen, Inc.*, 526 F. App'x 299 (4th Cir. 2013) (affirming district court's ruling that pollution exclusion applied to bar coverage for underlying CERCLA liability and potential liability in two related actions).

PCS Nitrogen argues the circuit court erred in granting Respondents' motions for summary judgment because New CNC received a valid assignment of Old CNC's insurance coverage rights through the 1986 transaction. Thus—PCS Nitrogen asserts—it is entitled to seek coverage under those policies. PCS Nitrogen claims it was not required to obtain insurer consent for the assignment of the benefits under the policies because these were post-loss assignments made after the environmental contamination of the Charleston Site occurred during the policy terms. PCS Nitrogen contends this argument is supported by the supreme court's reasoning in *Narruhn v. Alea London Limited*, 404 S.C. 337, 343–45, 745 S.E.2d 90, 93–94 (2013) (noting in dicta that "it is generally held that an assignment *after* a loss has already occurred does not require an insurer's consent.").

"The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *Palmetto Mortuary Transp., Inc. v. Knight Sys., Inc.*, 424 S.C. 444, 460, 818 S.E.2d 724, 733 (2018) (quoting *Schulmeyer v. State Farm Fire & Cas. Co.*, 353 S.C. 491, 495, 579 S.E.2d 132, 134 (2003)). "If the contract's language is clear and unambiguous, the language alone determines the contract's force and effect." *Id.* (quoting *Schulmeyer*, 424 S.C. at 460, 818 S.E.2d at 733). "When a contract is unambiguous a court must construe its provisions according to the terms the parties used; understood in their plain, ordinary, and popular sense." *Id.* (quoting *Schulmeyer*, 424 S.C. at 460, 818 S.E.2d at 733). Thus, "[t]his court is 'without authority to alter an unambiguous contract by construction or to make new contracts for the parties.'" *First S. Bank v. Rosenberg*, 418 S.C. 170, 180, 790 S.E.2d 919, 925 (Ct. App. 2016) (quoting *S.C. Dep't of Transp. v. M & T Enters. of Mt. Pleasant, LLC*, 379 S.C. 645, 655, 667 S.E.2d 7, 13 (Ct. App. 2008)).

In determining whether the circuit court erred in granting summary judgment, we must look to the terms of the policies and the assignment agreement at issue. Under the policies, Old CNC was the named insured. The policies stated, "The company will pay *on behalf of the insured* all sums which the insured shall become legally obligated to pay as damages because of . . . property damage . . . to which this insurance applies, *caused by an occurrence . . . .*" (emphasis added). The policies further provided, "Assignment of interest under this policy *shall not bind* the company *until its consent is endorsed hereon*." (emphasis added).

The policies additionally included a section titled "Actions Against Company," which stated:

No action shall lie against the company, unless, as condition precedent thereto, there shall have been full compliance with all of the terms of this policy, *nor until the amount of the insured's obligation to pay shall have been finally determined by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.*

Any person or organization or the legal representative thereof *who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy* to the extent of the insurance afforded by the policy.

(emphasis added).

The portion of the acquisition agreement titled "Assignment of Insurance Benefits" stated:

[B]y an Acquisition Agreement, dated as of October 31, 1986, entered into between [Old CNC] and [New CNC] . . . [Old CNC] has agreed to sell, convey, transfer, and assign . . . all of [Old CNC]'s rights, proceeds and other benefits to and under all of [Old CNC]'s insurance policies . . . .

. . . .

[Old CNC] by these presents does hereby transfer and assign to [New CNC], its successors and assigns forever, all of [Old CNC]'s rights, title and interest, legal and equitable, *in the benefits and proceeds* under all of its insurance policies *to the extent the same may be transferred and assigned* . . . .

(emphasis added).

Although the policies included the aforementioned anti-assignment clause, the majority rule is that such clauses are generally only enforceable *before* a loss occurs. *See* 3 *Couch on Insurance* § 35:8 (3d ed. 2018) ("Although there is some

authority to the contrary, the great majority of courts adhere to the rule that general stipulations in policies prohibiting assignments of the policy, except with the consent of the insurer, apply only to assignments before loss, and do not prevent an assignment after loss, for the obvious reason that the clause by its own terms ordinarily prohibits merely the assignment of the policy, *as distinguished from a claim arising under the policy*, and the assignment before loss involves a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a money claim." (emphasis added)); 17 *Williston on Contracts* § 49:126 (4th ed. 2018) ("As a general principle, a clause restricting assignment does not in any way limit the policyholder's power to make an assignment of the rights under the policy—*consisting of the right to receive the proceeds of the policy*—after a loss has occurred." (emphasis added)); *id.* ("After a loss occurs, the indemnity policy is no longer an executory contract of insurance.  It is now a vested claim against the insurer and can be freely assigned or sold like any other chose in action or piece of property.").

Our supreme court has noted this principle in prior opinions.  *See Narruhn*, 404 S.C. at 343–45, 745 S.E.2d at 93–94 ("Although we need not reach the issue here, it appears the referee did not believe Insurer's approval of the assignment of RKC's rights was required, and we note it is generally held that an assignment *after* a loss has already occurred does not require an insurer's consent."); *Ligon v. Metropolitan Life Ins., Co.*, 219 S.C. 143, 155, 64 S.E.2d 258, 264 (1951) ("It is well stated in 29 Am. Jur., Sec. 506, Page 410: 'General stipulations, in policies, prohibiting assignment thereof, except with the insurer's consent or upon giving some notice, or like conditions, have universally been held to apply only to assignments before loss, and, accordingly, not to prevent an assignment after loss or death, or the maturity of the policy, of the claim or interest in the insurance money then due.'").

Therefore, the pivotal inquiry in the case *sub judice* is at what point did the "loss," or as stated in the policy, the "occurrence," triggering coverage occur?  *See Moore v. Weinberg*, 373 S.C. 209, 220, 644 S.E.2d 740, 745 (Ct. App. 2007) ("South Carolina jurisprudence has long recognized that a chose in action can be validly assigned in either law or equity."); *Singletary v. Aetna Cas. & Sur. Co.*, 316 S.C. 199, 201–02, 447 S.E.2d 869, 870 (Ct. App. 1994) ("An assignee of a chose in action can claim no higher rights than his assignor had at the time of the assignment."); *id.* at 202, 447 S.E.2d at 870 ("Under South Carolina law, a party is not entitled to receive insurance proceeds in excess of their interest in the property.").

Although the property damage insured against—environmental contamination—occurred during the covered policy terms, the plain language of the policies state that Old CNC was not entitled to coverage "*until the amount of the insured's obligation to pay shall have been finally determined by judgment against the insured after actual trial or by written agreement of the insured*, the claimant and the company." (emphasis added). Because no actions were filed against Old CNC prior to the asset sale with New CNC, the loss insured against—as defined in the terms of these particular policies—had not yet occurred, and thus, no vested claims existed. Therefore, we find no error in the circuit court's determination that the assignments to the benefits and proceeds were pre-loss assignments requiring insurer consent, which was not obtained. Accordingly, the assignment agreement was essentially ineffective, and if PCS Nitrogen wanted to ensure its rights to enforce potential claims under the policies, it should have obtained insurer consent as it did for the liability policy not at issue in this case. *See Schulmeyer*, 353 S.C. at 495, 579 S.E.2d at 134 ("The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language."); *id.* ("Parties to a contract have the right to construct their own contract without interference from courts to rewrite or torture the meaning of the policy to extend coverage."); *Travelers Cas. & Sur. Co. v. U.S. Filter Corp.*, 895 N.E.2d 1172 (Ind. 2008) (where injuries had occurred but not yet been reported at the time of the relevant transactions, they did not constitute transferable choses in action for purposes of coverage when considered in context of consent-to-assign clauses); *Del Monte Fresh Produce (Haw.) Inc. v. Fireman's Fund Ins. Co.*, 117 Haw. 357, 369–70, 183 P.3d 734, 746–47 (2007) (no duty to defend or indemnify in CERCLA fumigant contamination action where attempted assignment by contract was invalid due to failure to obtain insurer consent).

**AFFIRMED.**[7]

---

[7] PCS Nitrogen further contends the circuit court erred in the analysis of its argument that PCS is entitled to coverage under a "de facto merger" theory. *See Simmons v. Mark Lift Industries*, 366 S.C. 308, 622 S.E.2d 213 (2006) (setting forth the circumstances in which a plaintiff may maintain a product liability claim under a successor liability theory against a successor corporation which has purchased the predecessor's assets). We decline to address this argument because the cases PCS cites do not address the question of insurance coverage, and it is unclear how a finding of successor liability under a de facto merger theory would provide access to coverage rights under Respondents' policies. *See Mead v. Beaufort Cty. Assessor*, 419 S.C. 125, 139, 796 S.E.2d 165, 172–73 (Ct. App.

**LOCKEMY, C.J., and SHORT, J., concur.**

---

2016) (noting the court may decline to address the merits of a question when appellant provides no legal authority regarding the particular argument).