# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Covil Corporation, by and through its Receiver, Peter D. Protopapas, Respondent,

v.

Pennsylvania National Mutual Casualty Insurance Company, Petitioner.

Appellate Case No. 2022-000366

———————

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

———————

Appeal From Richland County
Jean Hoefer Toal, Acting Circuit Court Judge

———————

Opinion No. 28221
Heard January 9, 2024 – Filed July 24, 2024

———————

## AFFIRMED AS MODIFIED

———————

David L. Brown, David Grant Harris, II, and Brady Allen Yntema, of Goldberg Segalla LLP, of Greensboro, NC, for Petitioner.

William Bradley Nes, of Washington, D.C.; Jonathan M. Robinson, Shanon N. Peake, and G. Murrell Smith, Jr., of Smith Robinson Holler DuBose Morgan, LLC, of Sumter, all for Respondent.

**JUSTICE FEW:** This case involves a coverage dispute between an insurer and a South Carolina corporation that has been defunct since the early 1990s. Covil Corporation—through its appointed receiver—sued Penn National Mutual Insurance Company alleging Penn National breached their contract for insurance by failing to contribute to a settlement in an asbestos case against Covil and other defendants. In the underlying case, David Rollins alleged Covil and others negligently exposed him to asbestos, which caused his mesothelioma. Penn National insured Covil during part of the time Rollins alleges Covil caused his exposure.

The circuit court granted summary judgment in favor of Covil, concluding Penn National was required to "indemnify Covil against the settlement of the Rollins action." The circuit court rejected Penn National's argument that (1) the lack of timely notice of the lawsuit defeated coverage, (2) summary judgment was premature because Penn National did not have a full and fair opportunity to complete discovery, and (3) two policy exclusions barred coverage. The court of appeals affirmed. *Covil Corp. ex rel. Protopapas v. Pa. Nat'l Mut. Cas. Ins. Co.*, 436 S.C. 85, 870 S.E.2d 191 (Ct. App. 2022). We affirm the court of appeals as modified.

## I.      Facts and Procedural History

According to Covil's motion for summary judgment, Covil Corporation was formed in 1954 and was "engaged in the installation and removal of insulation in various industrial facilities across South Carolina, and elsewhere." In 1991, Covil's business failed, and it ceased operations. In 2018, the circuit court appointed attorney Peter Protopapas as Covil's receiver. The appointment order empowered Protopapas with the "right and obligation to administer any insurance assets of Covil Corporation as well as any claims related to the actions or failure to act of Covil's insurance carriers." Since Protopapas was appointed as receiver, numerous plaintiffs have filed lawsuits against Covil alleging the company's operations caused their asbestos-related diseases.

On April 5, 2019, David Rollins filed a lawsuit in Hampton County against Covil and fifty-two other defendants alleging he was diagnosed with mesothelioma caused by asbestos exposure from his work. Rollins also alleged his mesothelioma was "caused by his exposure to asbestos brought home on the person and clothes of . . . his stepfather, Robert Ashworth," when Rollins was still a child.

Ashworth worked as a pipefitter for a company called Beta Construction from 1986 to 1988. All of his work for Beta Construction took place at the Bowater Paper Mill in Catawba, an unincorporated community in York County. Covil did all the piping insulation work at Bowater under a subcontract between March 16, 1986, and January 25, 1987. Rollins alleged Ashworth would come home from work covered in asbestos dust from Covil's insulation work, exposing Rollins. Penn National insured Covil while Ashworth worked at Bowater.

Penn National first received notice of the *Rollins* lawsuit on January 27, 2020, in an email from Protopapas. On February 3, counsel for Covil sent Penn National a copy of the *Rollins* complaint along with a letter requesting defense and indemnification in the lawsuit. One week later, on February 10, Protopapas sent an email informing Penn National that mediation was scheduled for the *Rollins* case on February 25. Protopapas attached an order from a different case granting sanctions for failure to participate in mediation. He wrote:

> The trial judge for this matter requires that insurance companies attend mediations with full settlement authority. This requirement is echoed in South Carolina's ADR rules. Attached is an order granting sanctions for failure to participate in a mediation in a non-asbestos case.

On February 14, Penn National responded with a letter informing Covil that it was able to contact defense counsel engaged by other Covil insurers and had requested copies of discovery. Penn National attached a separate document to the letter in which Penn National informed Covil that coverage had yet to be determined. The letter provided: "no action heretofore or hereafter taken by [Penn National] shall be construed as a waiver of the right of [Penn National], if in fact it has such right, to deny liability and withdraw from the case." We refer to this document as Penn National's "non-waiver letter."[1]

---

[1] The document is labeled "Non-Waiver Agreement" and is signed by Penn National, but it is not signed by Covil. Thus, although the document is labeled "Non-Waiver Agreement," it is not an "agreement" at all. We therefore refer to the document as the "non-waiver letter."

The mediation took place on February 25, 2020. A representative of Penn National attended the mediation and "expressed a willingness to contribute some amount to the settlement on behalf of Covil." Ultimately, Protopapas—on behalf of Covil—settled for an amount that is not disclosed in the record before us. Covil asked Penn National to contribute $50,000 to the settlement, but Penn National refused. Despite Penn National's refusal, Rollins was eventually paid the full amount of the settlement.

On February 28, 2020, Covil filed a breach of contract action against Penn National for failing to contribute $50,000 to the *Rollins* settlement. On April 22—before any discovery was completed—Covil moved for summary judgment on the issue of whether Penn National was required to contribute to the settlement of the *Rollins* case. On May 8, Penn National responded to the motion, arguing summary judgment should be denied because (1) it did not receive timely notice of the Rollins action, (2) summary judgment was premature, and (3) two exclusions in the policy bar coverage.

On August 13, 2020, the circuit court granted Covil's motion for summary judgment. The court of appeals affirmed. *Covil Corp.*, 436 S.C. at 91-98, 870 S.E.2d at 194-98. We granted Penn National's petition for a writ of certiorari to review the court of appeals' opinion. We affirm the court of appeals as modified.

## II.    Insurance Policy Notice Provision

Penn National argues it is not obligated to indemnify Covil because Covil failed to comply with a provision in the policy requiring that it provide to Penn National immediate notice of a lawsuit filed against it. The provision states, "If a claim is made or suit brought against the insured, the insured shall immediately forward to the Company every demand, notice, summons, or other process received by him or his representative." Although Rollins filed his complaint on April 5, 2019, and served the summons and complaint on Covil on April 25, Covil did not provide Penn National notice of the lawsuit until January 27, 2020. Thus, Penn National argues, Covil breached the notice provision by not providing timely notice of the *Rollins* lawsuit.

Covil argues, however, that Penn National must show it was prejudiced by the delay to defeat coverage. Penn National responds that this "notice-prejudice rule" is inapplicable in this case because it applies only where the rights of innocent third

parties are implicated.[2]  It argues such rights are not implicated here because the plaintiff in the *Rollins* lawsuit was fully compensated by Covil.  On this point, we agree with Penn National.

Historically, we have recognized that a notice provision in an insurance policy is a material term and that an insured's failure to provide the insurer with timely notice can lead to the forfeiture of coverage. *Lee v. Metro. Life Ins. Co.*, 180 S.C. 475, 486-87, 186 S.E. 376, 381 (1936) ("No rule of law is more firmly established in this jurisdiction than that one suing on a policy of insurance, where the notice required by the policy is not timely given, cannot recover.  And the Court has gone so far as to hold that the failure to give the required notice in the allotted time is fatal to the right of recovery, even if it be shown that the insurance company has suffered no harm by the delay.").  At least as early as 1971, however, South Carolina adopted the "notice-prejudice rule" for cases in which the rights of innocent third parties are compromised by an insured's failure to provide his insurer notice of the lawsuit.

> Although there is a division in the cases from other jurisdictions upon the question, . . . we think the sound rule to be that, in an action affecting the rights of innocent third parties under an automobile liability insurance policy, the noncompliance by the insured with policy provisions as to notice . . . will not bar recovery, unless the insurer shows that the failure to give such notice has resulted in substantial prejudice to its rights.

---

[2] Penn National also argues we should not consider Covil's notice-prejudice argument, as this issue was not accepted for review in our order granting Penn National's petition for a writ of certiorari.  This is without merit.  Covil—as the prevailing party in the lower courts—may properly argue that we should affirm based on a ground appearing in the record, even though it was not ruled upon by the lower courts. *I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 419, 526 S.E.2d 716, 723 (2000) ("[A] respondent—the 'winner' in the lower court—may raise on appeal any additional reasons the appellate court should affirm the lower court's ruling, regardless of whether those reasons have been presented to or ruled on by the lower court."); Rule 208(b)(2), SCACR ("Respondent's brief . . . may contain argument asking the court to affirm for any ground appearing in the record as provided by Rule 220(c).").

*Factory Mut. Liab. Ins. Co. of Am. v. Kennedy*, 256 S.C. 376, 381, 182 S.E.2d 727, 729-30 (1971); *see also* 256 S.C. at 381, 182 S.E.2d at 730 ("We so stated the rule in *Squires v. National Grange Mutual Ins. Co.*, 247 S.C. 58, 145 S.E.2d 673 [(1965)]."); *Neumayer v. Philadelphia Indem. Ins. Co.*, 427 S.C. 261, 267, 831 S.E.2d 406, 408-09 (2019) (tracing the "notice-prejudice rule" back to *Squires* in 1965).

Under the notice-prejudice rule, "Where the rights of innocent parties are jeopardized by a failure of the insured to comply with the notice requirements of an insurance policy, the insurer must show substantial prejudice to the insurer's rights" in order to defeat coverage. *Vermont Mut. Ins. Co. v. Singleton ex rel. Singleton*, 316 S.C. 5, 12, 446 S.E.2d 417, 421 (1994); *see also Neumayer*, 427 S.C. at 265-73, 831 S.E.2d at 408-12 (examining the history of the law regarding notice provisions in South Carolina). As we indicated in *Neumayer*, notice provisions in insurance policies "balance the insurer's important interests in receiving notice of a lawsuit" against an innocent third party's right to recovery for the insured's negligence. 427 S.C. at 272, 831 S.E.2d at 411. We stated, "The driving force behind the notice-prejudice rule is that there is 'no sound reason . . . to permit a mere technical noncompliance to deprive an innocent third party of benefits to which he would otherwise be entitled.'" *Id.* (quoting *Kennedy*, 256 S.C. at 381, 182 S.E.2d at 729).

In this case, the "driving force" has no force at all because no innocent third party's rights are implicated. The underlying plaintiff—Rollins—has already been paid the full amount of his settlement by Covil and other insurers. *See Prior v. S.C. Med. Malpractice Liab. Ins. Joint Underwriting Ass'n*, 305 S.C. 247, 250, 407 S.E.2d 655, 657 (Ct. App. 1991) (holding the notice-prejudice rule does not apply when there is no innocent third party and the underlying plaintiff has already been compensated). Because Rollins—the only potential innocent third party in this case—has been fully compensated, the "notice-prejudice rule" does not apply.[3]

---

[3] Covil argues the point in time for which the "rights of the innocent parties" should be evaluated is the time of the settlement agreement, not later when the funds were paid or not paid. We disagree. The fact Rollins was later paid the full settlement amount means his rights were not compromised and the notice-prejudice rule does not apply.

There is the possibility that we simply assume there are other asbestos plaintiffs out there whose potential settlement payments by Covil might be jeopardized if the receiver does not collect these funds. We certainly acknowledge this possibility, as it is clear Rollins is not the only victim of Covil's mishandling of asbestos. However, there is no evidence in the record that any such potential plaintiff is yet to be compensated or might someday make a claim against Covil. At oral argument, members of the Court pressed counsel for Covil as to whether any such plaintiff does or might exist, but counsel offered nothing to support the existence of any third party whose rights are jeopardized.

Covil argues this Court should expand the notice-prejudice rule to apply to all violations of notice provisions—regardless of whether innocent third party rights are implicated—on the basis of public policy. We disagree. This Court has consistently held, "Insurance companies and insureds are generally free to contract for exclusions or limitations on coverage." *E.g.*, *Nationwide Ins. Co. of Am. v. Knight*, 433 S.C. 371, 375, 858 S.E.2d 633, 635 (2021). In *Knight*, we emphasized that courts will enforce the terms of an automobile insurance policy unless a challenged provision violates a specific statute. We held "this Court has no authority to invalidate an automobile insurance policy provision simply because we believe it is inconsistent with our own notion of 'public policy.'" 433 S.C. at 376, 858 S.E.2d at 635.

The principle that courts have "no authority" to rewrite insurance policies based on "public policy" applies in other insurance contexts as well. *See S. S. Newell & Co. v. Am. Mut. Liab. Ins. Co.*, 199 S.C. 325, 332, 19 S.E.2d 463, 466 (1942) ("The judicial function of a court of law is to enforce an insurance contract as made by the parties, and not to re-write or to distort, under the guise of judicial construction, contracts, the terms of which are plain and unambiguous. It is not the province of the courts to construe contracts broader than the parties have elected to make them, or to award benefits where none was intended."). Thus, our courts will enforce the terms of all insurance policies, even if they appear to be unfair or to work injustice, unless the provision being challenged violates a specific statute or is found unenforceable under a well-established provision of law.

The "notice-prejudice rule"—a judicially-created fiction that operates to invalidate a notice provision in an insurance policy—is somewhat of an exception to this principle. We will not, therefore, expand the rule beyond its original purpose, which is to protect innocent third parties by preventing an insurer from enforcing a notice provision in its liability policy unless the insurer can prove it was prejudiced by the

lack of notice. In *Neumayer*, as a recent instance, the trial court refused to enforce the notice provision in an automobile liability policy even though the insurer proved prejudice, thereby expanding the notice-prejudice rule to void all notice provisions in automobile insurance policies. *See* 427 S.C. at 263, 831 S.E.2d at 407 ("The trial court found the clause in this policy void and accordingly required the insurance company to pay the full default judgment entered against its insured."). This Court reversed, noting "the legislature's recognition of the role notice provisions play in insurance contracts," and stating, "Had the General Assembly intended to categorically prohibit the enforcement of notice clauses in all policies, it would have done so." 427 S.C. at 273, 831 S.E.2d at 412; *see also id.* ("We therefore refuse to read [the applicable statute] to abolish notice and cooperation clauses in insurance contracts."). In *Neumayer*, we refused to extend the notice-prejudice rule beyond its original confines and we decline to do so here.

Relying on more general principles of contract law, however, Covil alternatively argues its untimely notice was not a material breach of the insurance contract, and thus Penn National should not be relieved of its duty to indemnify Covil. *See Butler v. Travelers Home & Marine Ins. Co.*, 433 S.C. 360, 366, 858 S.E.2d 407, 410 (2021) ("An insurance policy is a contract between the insured and the insurance company, and the policy's terms are to be construed according to the law of contracts." (quoting *Williams v. Gov't Emps. Ins. Co. (GEICO)*, 409 S.C. 586, 594, 762 S.E.2d 705, 709 (2014))). Under contract law, the party claiming a breach of contract must establish the breach was material. *See* 13 Sarah Howard Jenkins, *Corbin on Contracts* § 68.2, at 158-59 (Joseph M. Perillo ed., Revised ed. 2003) (stating as to contracts in general the "legal duty" of the non-breaching party is "suspended or discharged" "[o]nly if the effects of the breach are material"); *Evans v. Am. Home Assur. Co.*, 252 S.C. 417, 420, 166 S.E.2d 811, 813 (1969) (calling it "settled law" that "a liability insurer may successfully defend upon the ground that the insured has violated the cooperation clause of the policy only when the breach has been material . . ."); 14 Steven Plitt et al., *Couch on Insurance* § 199:25, at 81, 82 n.2 (Monique Leahy ed., 3rd ed. rev. 2020) (stating "to cause a breach of the policy condition sufficient to relieve the insurer from liability under the policy, many jurisdictions require that an insured's lack of cooperation be substantial and material" and collecting cases).

On this point, we agree with Covil. We begin our explanation by acknowledging there may be little practical difference between applying the "notice-prejudice rule" and analyzing whether Covil committed a material breach of the insurance contract. There is, however, an important philosophical difference. Under well-established

principles of contract law—"settled law" as we stated in *Evans*—to justify the forfeiture of Covil's contractual rights, Penn National must establish that Covil's failure to "immediately forward" notice constituted a "material breach."

To guide our courts in "determining whether the breach of a [contract] is . . . []material," this Court adopted the "standards" set forth in section 241 of the Restatement (Second) of Contracts. *Kiriakides v. United Artists Commc'ns, Inc.*, 312 S.C. 271, 276, 440 S.E.2d 364, 366-67 (1994); *Palmetto Mortuary Transp., Inc. v. Knight Sys., Inc.*, 424 S.C. 444, 461 n.5, 818 S.E.2d 724, 734 n.5 (2018). Section 241 provides,

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (Am. L. Inst. 1981).

As to subsection (a), the benefit Penn National reasonably expected from the notice provision in its policy was to be notified so it could adequately defend Covil. While Penn National certainly intended that by protecting Covil's interests it would protect its own, its contractual responsibility was to protect Covil. Thus, the point that is important to analyzing the "benefit . . . reasonably expected" under subsection (a) is not whether Penn National's interests were protected but whether Covil's interests

were. Penn National was not deprived of this benefit because Covil was represented by counsel hired by other insurers from the very beginning of the case. Those attorneys timely answered the complaint, conducted discovery, and handled other pretrial matters they deemed necessary to protect Covil. Thus, Covil's breach of the notice provision did not deprive Penn National from receiving the benefit it reasonably anticipated from requiring its insured to "immediately forward" the summons to it. Subsection (a) weighs heavily in favor of finding the breach was not material.

Subsection (b) weighs in favor of finding the breach was material. The subsection asks the court to analyze the extent to which the breaching party can make up for its failure to comply with the contract. Here, it is not possible for Covil to rectify its untimely notice.
Subsection (c) weighs in favor of finding the breach was not material because Covil would lose the benefit for which it bargained, indemnity coverage under the policy. However, Covil's forfeiture of insurance benefits in this case is not particularly significant because Covil is defunct, and thus *Covil* would lose nothing. Thus, subsection (c) weighs lightly in favor of an immaterial breach. As to subsection (d), the fact Covil's failure to provide timely notice is incurable weighs in favor the breach being material. However, because the breach had no impact on Penn National, the factor is insignificant on the facts of this case. Subsection (e) weighs marginally in favor of finding a material breach.

Evaluating all the factors set forth in section 241, the most significant one on the facts of this case is subsection (a), which weighs heavily against finding a material breach because Covil's attorneys protected all of Covil's interests. Penn National was deprived of no benefit for which it could be compensated, and there remains no harm for Covil to cure. Thus, we hold Covil's breach was not material, and Penn National cannot escape liability due to untimely notice.

Our ruling that Covil did not commit a material breach is dispositive of the notice question, but we nevertheless address the court of appeals' holding that by attending the mediation and expressing a willingness to contribute to a settlement, Penn National impliedly waived its right to timely notice. *Covil Corp.*, 436 S.C. at 94, 870 S.E.2d at 196. We respectfully disagree with the court of appeals.

"An insurance contract, like any other contract, may be altered by the contracting parties, and the insurer may, of course, waive any provision for forfeiture therein."

*Gandy v. Orient Ins. Co.*, 52 S.C. 224, 229, 29 S.E. 655, 656 (1898). "A waiver is a voluntary and intentional abandonment or relinquishment of a known right." *Janasik v. Fairway Oaks Villas Horizontal Prop. Regime*, 307 S.C. 339, 344, 415 S.E.2d 384, 387 (1992). "It may be stated in general that conduct which amounts to a waiver of a condition providing for the forwarding to the insurer of the summons or other process served upon the assured is that which lulls the insured into a feeling of security and renders it unconscionable for the insurer subsequently to raise the objection that such papers were not forwarded." *Boyle Rd. & Bridge Co. v. Am. Emps.' Ins. Co. of Bos., Mass.*, 195 S.C. 397, 402, 11 S.E.2d 438, 441 (1940).

First, and most importantly, there is nothing about an insurer attending a mediation or "express[ing] a willingness to contribute some amount to the settlement" that implies the insurer voluntarily and intentionally relinquished its right to contest sufficient notice under the policy provision. Second, Penn National's non-waiver letter specifically stated that Penn National "contends, or may later contend, that the Assured is not entitled to . . . coverage *in view of the fact that the claims were first tendered on January 27, 2020*," (emphasis added), or in other words, because Covil violated the notice provision. The letter continued: "no action heretofore or hereafter taken by the Company shall be construed as a waiver . . . ." Finally, Covil's February 10, 2020 email to Penn National threatened sanctions if Penn National did not attend the mediation. Attending and even participating in a mediation under these circumstances could not have "lull[ed Covil] into a feeling of security," *Boyle*, 195 S.C. at 402, 11 S.E.2d at 441, and Penn National's actions are clearly not "a voluntary . . . relinquishment of a known right," *Janasik*, 307 S.C. at 344, 415 S.E.2d at 387.

### III.   Summary Judgment

Penn National argues the court of appeals erred in holding summary judgment was not premature. We disagree. First, we are not concerned here with discovery as to Covil's liability in the *Rollins* action. Discovery on those issues became moot when the *Rollins* case was settled at the February 25 mediation. Our focus is on what discovery Penn National was entitled to conduct in the *Covil* lawsuit. In the *Covil* lawsuit, Penn National could have conducted discovery on whether Covil's failure to provide timely notice was a material breach and whether the policy exclusions apply. On those points, Penn National has not identified—either to the circuit court or on appeal—any significant inquiry it was denied the opportunity to make. Thus, Penn National has not demonstrated a likelihood that further discovery in the *Covil*

action will uncover additional, relevant evidence. Like the court of appeals, we see no basis for a finding the circuit court's summary judgment ruling was premature.

## IV. Policy Exclusions

Penn National argues the court of appeals erred in finding the policy's "Products Hazard" and "Completed Operations Hazard" exclusions did not apply. We disagree. The policy states that coverage "does not apply to bodily injury . . . included within the Completed Operations Hazard or the Products Hazard."

"Insurance policy exclusions are construed most strongly against the insurance company, which also bears the burden of establishing the exclusion's applicability." *Owners Ins. Co. v. Clayton*, 364 S.C. 555, 560, 614 S.E.2d 611, 614 (2005).

### i. Products Hazard Exclusion

The policy defines "products hazard" as follows:

> "**products hazard**" includes **bodily injury** . . . arising out of the named insured's products . . . but only if the **bodily injury** or property damage occurs away from the premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others.

Before turning to the parties' arguments about whether the Products Hazard exclusion applies to bar coverage, we point out that the Products Hazard exclusion applies only when the "bodily injury" arises out of the "named insured's products." By definition, the "named insured's products" are products "manufactured . . . or distributed by the named insured." The circuit court found that "no evidence in this case or in the underlying Rollins action suggests that Covil supplied asbestos insulation to the Bowater facility between 1986 and 1987." Covil's liability is therefore based on Covil *installing* rather than *supplying* the insulation that ultimately caused Rollins's injury. Thus, the Products Hazard exclusion is not applicable at all. We address the parties' arguments anyway.

Penn National argues Rollins's injury arose from Covil's products because Rollins sued Covil as a "Product Defendant." Penn National argues labeling Covil as a

"Product Defendant" means Rollins's alleged liability is based on Covil's products. Penn National also argues Covil's products were "relinquished to others" when Rollins was exposed to asbestos, and therefore the exclusion applies to bar coverage.

### 1.    Covil as a "Product Defendant"

Penn National argues "other jurisdictions have held that when the claims asserted in the underlying lawsuit allege liability against the insured based solely on the defective nature of the insured's product, the 'products hazard' applies."  Penn National points to the *Rollins* complaint which identified Covil as a "Product Defendant."  The complaint generally alleged "Products Defendants" were liable as follows:

> Plaintiff's claims against the Product Defendants, as defined herein, arise out of Defendants' purposeful efforts to serve directly or indirectly the market for their asbestos and/or asbestos-containing products in this State, either through direct sales or through utilizing an established distribution channel with the expectation that their products would be purchased and/or used within South Carolina.

As to Covil specifically, the complaint alleged:

> At all times material hereto, COVIL CORPORATION mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation.  COVIL CORPORATION is sued as a Product Defendant.

Penn National argues the Products Hazard exclusion applies because Covil was labeled as a "Product Defendant" and only products liability causes of action were brought against Covil.  We disagree.

In *Collins Holding Corp. v. Wausau Underwriters Ins. Co.*, 379 S.C. 573, 666 S.E.2d 897 (2008), we held:

> [T]he obligation of a liability insurance company to defend and indemnify is determined by the allegations in the complaint. If the facts alleged in the complaint fail to bring a claim within the policy's coverage, the insurer has no duty to defend. In examining the complaint, a court must look beyond the labels describing the acts to the acts themselves which form the basis of the claim against the insurer.

379 S.C. at 577, 666 S.E.2d at 899 (citations omitted). Here, the complaint was not limited to allegations of products liability. In the same paragraph of the complaint that labels Covil as a "Product Defendant," Rollins alleged liability based on Covil's "installation and removal of asbestos-containing thermal insulation." By examining the specific actions described in Rollins's complaint rather than focusing solely on the labels he assigned, it is clear that Rollins alleged—at least in part—that his injuries resulted from Covil's activities related to the installation and removal of insulation, actions not excluded as a "products hazard."

## 2. Relinquishment

Penn National also argues the exclusion applies because the exposure to Rollins is alleged to be "take-home" exposure, and thus physical possession of Covil's products had necessarily been "relinquished" as required by the terms of the exclusion. The very necessity of Penn National making this argument demonstrates the exclusion does not apply.

The definition of "products hazard" describes an injury that "occurs away from the premises owned by or rented to the named insured." The exclusion thus contemplates a situation where the insured manufactures or distributes products at a facility it owns or rents and the injury occurs away from that facility. A product is then "relinquished" when the insured places its products into the stream of commerce. However, Covil did not own or rent the Bowater facility. The bodily injury occurred after Covil's work at the Bowater facility led to asbestos dust covering Rollins's stepfather, who then exposed Rollins in their home. It is impossible to apply the "products hazard" definition to this case, as the facts here

deviate significantly from the scenario contemplated in the definition. For this reason, the Products Hazard exclusion does not apply.

### ii. Completed Operations Hazard Exclusion

Covil argues the Completed Operations Hazard exclusion "may" apply to bar coverage. The policy excludes liability from a "completed operations hazard," defined as:

> "**completed operations hazard**" includes **bodily injury** . . . arising out of operations . . . but only if the **bodily injury** . . . occurs after such operations have been completed or abandoned and occurs away from the premises owned by or rented to the named insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:
>
> (1) when all operations to be performed by or on behalf of the named insured under the contract have been completed,
>
> (2) when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or
>
> (3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as part of the same project.

Thus, the Completed Operations Hazard exclusion applies to claims (1) arising out of the insured's operations, (2) when the alleged bodily injury occurs after the insured's operations are completed, and (3) where the alleged bodily injury occurs away from the premises owned by or rented by the named insured. Unlike the Products Hazard exclusion, the Completed Operations Hazard exclusion does not require the "bodily injury" arise out of the "named insured's products."

Penn National argues that if the take-home exposure occurred because a portion of Covil's operations had already been put to its intended use, the Completed Operations Hazard exclusion bars coverage. Penn National argues this question "is a genuine issue of disputed fact, which has not been established . . . by any 'evidence' submitted by Covil" and summary judgment was thus improper. We disagree.

Covil did work at the Bowater facility from March 16, 1986, to January 25, 1987. Rollins was exposed to asbestos through take-home exposure during the period in which Covil performed under the subcontract. Therefore, the exposure occurred (1) before all performance under Covil's contract was complete, (2) before operations at the Bowater facility were complete, and (3) before Covil's work at the Bowater facility was put to its intended use. Thus, the Completed Operations Hazard exclusion does not apply, and the court of appeals correctly affirmed summary judgment on its application.

## V.     Conclusion

For these reasons, the decision of the court of appeals is

**AFFIRMED AS MODIFIED.**

**BEATTY, C.J., HILL, J., and Acting Justice James Edward Lockemy, concur. KITTREDGE, J., concurring in part and dissenting in part in a separate opinion.**

**JUSTICE KITTREDGE:** I concur in part and dissent in part. I concur with the majority insofar as the policy exclusions are concerned—the policy exclusions asserted by Petitioner Pennsylvania National Mutual Casualty Insurance Company are not applicable. I further agree with the majority's rejection of the entry of summary judgment based on Penn National's purported waiver of its right to timely notice. In my judgment, the evidence relied upon by Respondent Covil Corporation to establish Penn National's waiver of the notice provision falls short of the summary judgment standard. I respectfully disagree, however, with the majority's finding that Covil's breach of the notice provision was immaterial, for I view the majority's immaterial-breach approach as indistinguishable from the application of the notice-prejudice rule. As a result, I would reverse the court of appeals' decision and remand the matter to the trial court for further proceedings on the enforceability of the notice provision.